475 A.2d 428

In the Matter of the **LEGISLATIVE DISTRICTING OF
the STATE.**

**Misc. Nos. 2–11, Sept. Term, 1982.**

Court of Appeals of Maryland.

June 4, 1982.

Opinion May 29, 1984.

C. Lawrence Wiser, petitioner, Kensington, in pro. per.

Stanley D. Abrams, Chevy Chase, for Bruce A. Goldensohn and amicus curiae, City of Gaithersburg.

Roger W. Titus, Sp. Counsel, Rockville, for amicus curiae, Mayor and Council of Rockville.

W. Shepherdson Abell and Marianne K. Renjilian, Chevy Chase, for amicus curiae, Montgomery County Legislative Delegation.

Read K. McCaffrey, Baltimore, for Carville L. Collins et al., petitioners.

Robert B. Ostrom, County Atty., Upper Marlboro, for amicus curiae, Prince George's County.

Richard L. Andrews, petitioner, Baltimore, in pro. per.

Charles K. Graham, petitioner, Baltimore, in pro. per.

M. Albert Figinski, Baltimore, for amicus curiae, Gerald J. Curran.

Frank G. Lidinsky, Baltimore, for Joseph T. Landers, III, et al., petitioners.

Thomas W. Chamberlain and Michael H. Weir, Baltimore, for amici curiae, themselves.

Linda H. Lamone, Diana G. Motz, Mary N. Humphries, James L. Shea and Robert A. Zarnoch, Asst. Attys. Gen., Baltimore, for the State.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

## PER CURIAM ORDER

WHEREAS, petitions were filed by various registered voters of the State with this Court as authorized by Section 5 of Article III of the Constitution of Maryland challenging the constitutionality of the 1982 Legislative Districting Plan which was approved and became law on February 26, 1982; and

WHEREAS, this Court appointed a Special Master to schedule hearings and to submit his findings of fact and conclusions of law to the Court; and

WHEREAS, this Court has considered the findings and conclusions of the Special Master, the exceptions filed thereto and the oral arguments of the parties and *amici curiae* presented in support of their respective positions; now, therefore, it is this 4th day of June, 1982

ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring, that for reasons to be set forth in an opinion later to be filed, the petitions challenging the 1982 Legislative Districting Plan (House Joint Resolution No. 32) having failed to establish any violations of the federal constitution or the Constitution of Maryland, the exceptions to the Special Master's report taken by the State be, and they are hereby, sustained and all other exceptions are hereby overruled, and the legislative districts of the State shall be as established in and by House Joint Resolution No. 32; and it is further

ORDERED, that pursuant to the provisions of Section 5 of Article III of the Constitution of Maryland, the provi-

sions of Section 9 of Article III of the Constitution shall govern the age, citizenship and residency requirements for election of Senators and Delegates to the General Assembly of Maryland except that for the primary and general elections of 1982, only, any person seeking election as a Senator or Delegate must have resided in the district which he or she seeks to represent not later than July 6, 1982.

MURPHY, Chief Judge.

This case involves a number of challenges to the constitutionality of Maryland's Legislative Districting and Apportionment Plan (the Plan), as enacted by House Joint Resolution No. 32 (H.J.R. 32) at the 1982 session of the General Assembly.

## I

■ Under the Constitution of Maryland, Article III, § 5, the Governor is required, after each federal decennial census, and after public hearings, to prepare a Plan setting forth the boundaries of the legislative districts for electing members of the Senate and House of Delegates. The Plan is required to conform to the dictates of §§ 2, 3 and 4 of Art. III of the Maryland Constitution, which respectively provide:

Section 2: "The membership of the Senate shall consist of forty-seven (47) Senators. The membership of the House of Delegates shall consist of one hundred forty-one (141) Delegates."

Section 3: "The State shall be divided by law into legislative districts for the election of members of the Senate and House of Delegates. Each legislative district shall contain one (1) Senator and three (3) Delegates. Nothing herein shall prohibit the subdivision of any one or more of the legislative districts for the purpose of electing members of the House of Delegates into three (3) single-member delegate districts or one (1) single-member delegate district and one (1) multimember delegate district."

Section 4: "Each legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population. Due regard shall be given to natural boundaries and the boundaries of political subdivisions."

The Plan is also required to comply with federal constitutional constraints imposed by the equal protection clause of the fourteenth amendment, *see Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964),[1] and with the fifteenth amendment, *see Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).[2]

Following completion of the 1980 federal census, Governor Harry Hughes, on April 13, 1981, appointed a five-member Advisory Committee on Reapportionment and Redistricting to assist him in developing a new legislative districting and apportionment plan.[3] The Committee conducted numerous public hearings throughout the State and submitted its recommendations to the Governor on December 8, 1981. Two public hearings were held by the Governor later that month to permit comment on the recommended plan. The Governor thereafter made several changes in the Committee's proposal, and submitted the Plan to the General Assembly on January 13, 1982; it was introduced as H.J.R. 32 and after legislative hearings were conducted, the resolution was approved by the General Assembly and became

---

**1.** The equal protection clause provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws."

**2.** The fifteenth amendment provides: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

**3.** The Committee was chaired by William S. James, State Treasurer, and included then Senate President James Clark, Jr., Speaker of the House Benjamin L. Cardin, Dr. C. Vernon Gray, a Democrat from Howard County and a professor at Morgan State University, and Barbara Fetterhoff, a Republican from Washington County and a member of the League of Women Voters.

law on February 26, 1982 pursuant to Art. III, § 5 of the Maryland Constitution.[4]

Under the provisions of Art. III, § 5 of the State Constitution, the Court of Appeals of Maryland is vested with original jurisdiction, upon petition filed by any registered voter, "to review the legislative districting of the State and [to] grant appropriate relief, if it finds that the districting of the State is not consistent with requirements of either the Constitution of the United States of America, or the Constitution of Maryland." A petition challenging H.J.R. 32 was filed on March 2, 1982, by Montgomery County registered voter and former State Senator, C. Lawrence Wiser, thereby invoking our original jurisdiction. Recognizing the likelihood of additional challenges, and the need for a Special Master to conduct hearings and submit findings of fact and conclusions of law to the Court, we designated the Honorable W. Albert Menchine, a retired Associate Judge of the Court of Special Appeals, to act in that capacity. By order dated March 5, 1982, we directed that any registered voter who claimed that the 1982 Legislative Districting Plan, or any part thereof, was invalid should "intervene in these proceedings by petition filed ... [by] March 31, 1982 setting forth his objection to said plan and containing the particular part or parts of the plan claimed to be unconstitutional and the factual and legal basis for such claims, and the particular relief sought, including any alternative district configuration suggested or requested by the petitioner."

Ten petitions in all were filed in opposition to H.J.R. 32. The Wiser petition, Misc. No. 2, was consolidated with Misc. No. 5, which was brought by Bruce Goldensohn, Mayor of Gaithersburg, since both petitions challenged the districting of Montgomery County, *i.e.*, Districts 14–20, inclusive. It was alleged that several of these districts violated the state constitutional requirement of compactness (District 17 being designated as the chief offender). Other principal claims were that H.J.R. 32, as it divided Montgomery Coun-

---

4. Three maps delineating the approved legislative districts are set forth in Appendix A to this opinion.

ty, (1) disregarded "communities of interest," in violation of the state constitutional requirement of due regard for natural boundaries and political subdivisions; (2) that it violated the equal protection clause by improperly protecting incumbent candidates, all of whom lived in the southern portion of Montgomery County; and (3) that it violated the equal protection clause by diluting the voting strength of residents of the incorporated municipalities of Gaithersburg and Rockville by including both cities in District 17.[5] Both petitions provided alternative districting configurations.

Miscellaneous No. 3, brought by Carville L. Collins, *et al.*, challenged H.J.R. 32 because of the way in which Howard County was divided. The principal charges were that the Plan (1) violated the requirement of due regard for natural boundaries and the boundaries of political subdivisions by dividing Columbia, a large unincorporated residential-business area of the county in half and by crossing county lines with House of Delegates Subdistricts 4B, 13B and 14B, and (2) that the voting strength of blacks in western Columbia was invidiously diluted, in violation of the equal protection clause.

Miscellaneous No. 4, brought by Richard L. Andrews, was consolidated with two other challenges involving the districting of Baltimore City, Misc. No. 8, filed by Vernon L. Morris, *et al.*, and Misc. No. 9, by Joseph T. Landers, III, *et al.* Taken together, these petitions alleged (1) that Districts 42 and 44 were unconstitutionally noncompact; (2) that the use of three-member at-large delegate districts invidiously diluted the voting strength of blacks, in violation of the equal protection clauses of the federal and state constitutions; (3) that district lines were intentionally drawn to divide Republicans among several districts, diluting their voting strength in violation of the equal protection clause;

---

**5.** Amicus Curiae briefs were submitted by the Mayor and Council of Rockville and the City of Gaithersburg, principally contending that the legislative districts in Montgomery County were not compact in form as required by § 4 of Article III of the Maryland Constitution.

(4) that the boundary between Districts 47 and 41 did not give due regard to the natural boundary of Frederick Avenue; (5) that the inclusion of the predominantly black Morgan State University community in District 43, which is predominantly white, rather than in District 44, which is racially balanced, invidiously diluted black voting strength and divided a black "community of interest," in violation of the equal protection clause; and (6) that the lines between Districts 43 and 44 failed to give due regard to natural boundaries.

Miscellaneous No. 6, brought by William Rush, related principally to the districting of Baltimore County. It was the petitioner's claim that Districts 6 through 9, and particularly District 8, failed to abide by the constitutional requirements of compactness and due regard for natural boundaries or the boundaries of political subdivisions. The petitioner also asserted that H.J.R. 32, as a whole, did not provide for apportionment of substantially equal population, and that the Plan's enactment was not preceded by public hearings adequate to satisfy state constitutional requirements. An alternative configuration for districting Baltimore County was submitted with this petition.

Miscellaneous No. 7, brought by Sarah Boyd and George M. Nutwell, challenged the manner in which H.J.R. 32 districted the counties in Southern Maryland. It was contended (1) that Southern Anne Arundel County was severed from the northern portion of the county and combined with all of Calvert and part of St. Mary's County, in Senatorial District 29, without due regard for natural boundaries and the boundaries of political subdivisions; (2) that District 29 was unconstitutionally noncompact; (3) that the creation of two House single-member districts, 29B and 29C, rather than one two-member delegate district, resulted in population inequalities violative of the equal protection clause, and the state constitutional requirement of apportionment in substantially equal numbers; and (4) that the division of Anne Arundel, Calvert, Charles and St. Mary's Counties, in creation of Districts 28 and 29 and their respective subdis-

tricts, violated requirements of compactness and due regard for natural boundaries and the boundaries of political subdivisions. The petitioners offered an alternative districting configuration which, *inter alia,* combined Calvert and St. Mary's Counties into a single district, and reunited southern Anne Arundel County with the rest of that county's territory.

Miscellaneous No. 10, filed by Thomas R. Falcinelli, challenged H.J.R. 32 in its entirety. Two issues were raised, namely, (1) that the use of multimember House delegate districts violated the equal protection clause, and (2) that the hearings held before the Advisory Committee were insufficient to satisfy the constitutional requirement of public hearings precedent to the preparation of the Governor's plan.

Miscellaneous No. 11, brought by Victor H. Laws, *et al.* (all members of the Wicomico County Council), challenged the districting of the southern Eastern Shore. Their claims were that the lines between Districts 37 and 38 failed to give due regard to natural boundaries and the boundaries of political subdivisions, and divided constitutionally protected communities of interest in and around the municipality of Salisbury; and that the division of the black community of interest located around Salisbury was invidious and violative of the equal protection clause. These petitioners sought a single district comprised solely of Wicomico and Worcester Counties, and the combining of all of Somerset and Dorchester Counties with parts of Talbot and Caroline Counties.

Pursuant to our order of March 5, 1982, the State filed timely answers to the petitions, evidence was taken by the Special Master on April 14, 1982, and he heard oral arguments on April 28, 1982. The Special Master, in a detailed and thorough report to the Court, found no merit in any of the petitions except Misc. No. 9, as to which he concluded that Baltimore City District 44 violated the compactness requirement of § 4 of Art. III of the Maryland Constitution.

In his report, the Master proposed alterations to Districts 43 and 44 which he believed would remedy the asserted constitutional defect in District 44.

Exceptions were taken both by the State and the petitioners to the Special Master's report, as to which we heard oral argument on June 1, 1982. By per curiam order dated June 4, 1982, a majority of the Court concurring, we concluded for reasons to be set forth in an opinion later to be filed, that none of the petitions established any violations of the state or federal constitutions. We therefore sustained the State's exceptions to the Special Master's report and overruled all other exceptions. Accordingly, we concluded in the per curiam order that "the legislative districts of the State shall be as established in and by Joint House Resolution No. 32." We now give our reasons for so holding.

## II

A brief review of fundamental state and federal constitutional principles governing the legislative districting and apportionment process is prerequisite to a proper understanding of our disposition of the various contentions raised by the parties.

The equal protection clause of the fourteenth amendment requires that the seats in both houses of a bicameral state legislature be apportioned on a substantially equal population basis; this cardinal principle is the *sine qua non* of fair representation, assuring that the vote of any citizen is approximately equal in weight to that of any other citizen in the State. *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Maryland Committee for Fair Representation v. Tawes,* 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964). Of course, state legislative districts may be substantially equal in population and still be in violation of the fourteenth amendment because of invidious discrimination against racial or ethnic minorities in the apportionment process. *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Whitcomb v.*

*Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). It is, however, a basic principle of federal constitutional law that only if the discrimination is purposeful can there be a violation of the equal protection clause. *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Hornbeck v. Somerset Co. Bd. of Educ.,* 295 Md. 597, 458 A.2d 758 (1983). Thus, a claim of unconstitutional dilution of racial or ethnic voting strength requires proof that the challenged plan has an intentionally discriminatory effect; it is not enough to show that those allegedly discriminated against have not obtained legislative representation in proportion to their numbers. *Mobile v. Bolden, supra; White v. Regester, supra.* In other words, it must be shown that the disputed districting plan was conceived or operated as a purposeful device to further racial or ethnic discrimination. *Mobile v. Bolden, supra; Whitcomb v. Chavis, supra.*[6]

A multimember legislative district is not per se unconstitutional under the equal protection clause. *Burns v. Richardson,* 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); *Fortson v. Dorsey,* 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). However, such legislative apportionments may violate the fourteenth amendment if their purpose were invidiously to minimize or cancel the voting potential of racial or ethnic minorities. *Mobile v. Bolden, supra; White v. Weiser,* 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); *White v. Regester, supra.* To prove such an illegal purpose requires more than a mere showing that the group allegedly discriminated against has not elected representatives in proportion to their numbers. *Mobile v. Bolden, supra,* 446 U.S. at 66, 100 S.Ct. at 1499. Nor does legislative districting to minimize contests between incumbents establish per se invidiousness in violation of the

---

**6.** A racially discriminatory motivation is also a necessary ingredient of a fifteenth amendment violation. *Mobile v. Bolden, supra,* 446 U.S. at 62, 100 S.Ct. at 1497.

fourteenth amendment. *White v. Weiser, supra; Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *Davenport v. Apportionment Comm'n,* 65 N.J. 125, 319 A.2d 718 (1974). Neither does the drawing of legislative districts in such a manner as to intentionally enhance the chances for election of nonwhite representatives constitute a per se violation of the equal protection clause. *United Jewish Organizations v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). Similarly, an intentional effort to district so as to create a balance between two primary partisan political parties does not violate the fourteenth amendment. *Gaffney v. Cummings, supra.*

■ While the "overriding objective" in state legislative districting is substantial equality of population among the various districts, *Reynolds v. Sims, supra,* 377 U.S. at 579, 84 S.Ct. at 1390, the Supreme Court recognized in that case that other valid considerations, which do not significantly impair equality of apportionment, may be taken into account in the districting and apportionment of state legislative bodies. It said:

"A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. Valid considerations may underlie such aims. Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering. Single-member districts may be the rule in one State, while another State might desire to achieve some flexibility by creating multimember or floterial districts." *Id.* at 578–579, 84 S.Ct. at 1390 (footnotes omitted).

■ Consistent with these principles from *Reynolds,* § 3 of Article III of the Maryland Constitution, as already observed, permits both single-member and multi-member delegate districts; and § 4 directs that legislative districts

"shall consist of adjoining territory, be compact in form, ... of substantially equal population [and] [d]ue regard shall be given to natural boundaries and the boundaries of political subdivisions." [7] Of these constitutional requirements, that which mandates that legislative districts consist of adjoining territory (*i.e.* contiguity) and be compact in form have been considered by other states having similar provisions in their constitutions. These courts have held that the contiguity and compactness requirements, and particularly the latter, are intended to prevent political gerrymandering.[8] *See, e.g., Schrage v. State Board of Elections,* 88 Ill.2d 87, 58 Ill.Dec. 451, 430 N.E.2d 483 (1981); *Preisler v. Doherty,* 365 Mo. 460, 284 S.W.2d 427 (1955); *Schneider v. Rockefeller,* 31 N.Y.2d 420, 340 N.Y.S.2d 889, 293 N.E.2d 67 (1972); *Opinion to the Governor,* 101 R.I. 203, 221 A.2d 799 (1966). The contiguity requirement mandates that there be no

---

**7.** Prior to 1970, the Maryland Constitution did not contain any provision in compliance with federal constitutional requirements for reapportionment of the state legislature. Section 3.04 of the 1968 draft Constitution of Maryland, proposed for adoption by the Maryland Constitutional Convention of 1967, provided in pertinent part that the population represented by each senator and delegate "shall be substantially equal"; and that each district "shall consist of adjoining territory and be compact in form [and] [d]ue regard shall be given to natural boundaries and the boundaries of political subdivisions." While the draft Constitution was rejected by the people of Maryland upon referendum held on May 14, 1968, the substantial equality of population, "adjoining territory" and "compact in form" provisions of that document were later included in a constitutional amendment proposed by ch. 785 of the Acts of 1969 and ratified by the people on November 3, 1970. By ch. 363 of the Acts of 1972, ratified on November 7, 1972, the Constitution was again amended to include the provision, first included in the 1968 draft Constitution, that "Due regard shall be given to natural boundaries and the boundaries of political subdivisions."

**8.** The word "gerrymander" was given birth in 1812 following a cartoonist's drawing of a Massachusetts legislative district that he described as appearing like a "salamander." An astute observer suggested that the district might more properly be described as a "gerrymander" after then Governor of Massachusetts Eldridge Gerry who had a role, albeit a minor one, in the construction of the district. *See* Hardy, *Considering the Gerrymander,* 4 Pepperdine L.Rev. 243, 255 (1977).

division between one part of a district's territory and the rest of the district; in other words, contiguous territory is territory touching, adjoining and connected, as distinguished from territory separated by other territory. *See, e.g., Schneider; supra; In re Sherrill,* 188 N.Y. 185, 81 N.E. 124 (1907). On the other hand, the ideal of compactness, in geometric terms, is a circle, with the perimeter of a district equidistant from its center. *See, e.g.,* Schwartzberg, *Reapportionment, Gerrymanders and the Notion of "Compactness,"* 50 Minn.L.Rev. 443 (1966); Roeck, *Measuring Compactness as a Requirement of Legislative Apportionment,* 5 Midwest J.Pol.Sci. 70 (1961). With the possible exception of Colorado, however (*see Acker v. Love,* 178 Colo. 175, 496 P.2d 75 (1972)), no jurisdiction has defined or applied the compactness requirement in geometric terms. On the contrary, most jurisdictions have concluded that the constitutional compactness requirement, in a state legislative redistricting context, is a relative rather than an absolute standard.

■ *People v. Thompson,* 155 Ill. 451, 40 N.E. 307, decided in 1895, was the first case to discuss compactness authoritatively under a state constitutional provision requiring contiguous and compact districts apportioned on a population basis.[9] The court there eschewed adopting a standard dictionary definition of the word "compact" as meaning "dense," "pressed together," or "close, near to a common center," 40 N.E. at 315. It recognized that the most compact district territorially would be a circular plane, every point on the boundary of which would be equidistant from the center; and that the next most compact district would be a square. *Id.* The court held, however, that "anything like close approximation to perfect compactness of territory, in the sense of equal nearness of its points to a

---

9. Equal apportionment, contiguity and compactness have been referred to as the trinity of equitable representation. Hacker, *Congressional Districting,* Brookings Institution, 49 (1964). Contiguity and compactness are not, however, federal constitutional requirements. *See Gaffney v. Cummings, supra.*

common center, could not have been meant." *Id.* After noting that the compactness provision, in application, was affected and influenced by the requirement of equality in population among the various districts, the court concluded that, as used in the Illinois Constitution, the term "compact" meant "closely united, territorially." *Id.* Later Illinois cases have adhered closely to the principles of *Thompson. See Schrage v. State Board of Elections,* 88 Ill.2d 87, 58 Ill.Dec. 451, 430 N.E.2d 483 (1981); *People ex rel. Scott v. Grivetti,* 50 Ill.2d 156, 277 N.E.2d 881 (1972); *People ex rel. Heffernan v. Carlock,* 198 Ill. 150, 65 N.E. 109 (1902). While other cases are generally in accord with *Thompson,* some have expanded or enlarged upon its rationale. In *Opinion to the Governor,* 101 R.I. 203, 221 A.2d 799 (1966), the court said that the term "compact" has no precise or exact meaning within the context of that state's constitutional provision requiring that legislative districts be "as compact in territory as possible." Instead, the court held that the term had reference to a principle, rather than to a definition, and had meaning "only within an appropriate factual context." 221 A.2d at 802. Referring to Rhode Island's irregular boundaries, its bays, inlets, islands, rivers, lakes and other geographical features, and to the overriding requirement that districts be comprised of substantially equal population, the court said that the compactness requirement did not mean that the state had to be divided into districts comprised of circular planes or squares. *Id.* The compactness requirement, the court explained, is an anti-gerrymandering safeguard to provide the electorate with effective representation, rather than with a design to establish an orderly and symmetrical pattern of electoral districts; it was proper, therefore, to consider natural, historical and geographical boundaries, as well as political lines, in drawing districts so long as the purpose was not to achieve a political gerrymander prohibited by the compactness provision. *Id.*

Virtually the same views were expressed in *Schneider v. Rockefeller,* 31 N.Y.2d 420, 340 N.Y.S.2d 889, 293 N.E.2d 67

(1972). Within the context of New York's constitutional provision that districts be compact in form, the court said that the requirement was a "practical" one, without a precise meaning. 340 N.Y.S.2d at 896, 293 N.E.2d at 72. The compactness requirement, the court said, must be interpreted and applied so as to accommodate the overriding goal of equality of population among the various districts; and it did not violate the constitutional compactness mandate to take account of existing political subdivision lines, topography, the irregularity of state and municipal boundaries, means of transportation and lines of communication. *Id.*[10]

*Commonwealth ex rel. Specter v. Levin*, 448 Pa. 1, 293 A.2d 15 (1972), in interpreting Pennsylvania's constitutional compactness requirement, concluded "that there is a certain degree of unavoidable noncompactness in any apportionment scheme." 293 A.2d at 23. The court recognized that the paramount objective of achieving substantial equality of population, the unevenness of population densities within the state, and efforts to maintain the integrity of boundaries of political subdivisions, ordinarily result in the drawing of districts that are not models of geometric compactness. An odd shaped district is not, therefore, necessarily a reliable sign of a political gerrymander, the court said; rather, the compactness of legislative districts must be evaluated objectively and with allowance for the elements of unavoidable noncompactness for reasons similar to those outlined in *Opinion to the Governor* and *Schneider, supra.*[11]

*Preisler v. Kirkpatrick*, 528 S.W.2d 422 (Mo.1975), also recognized that a degree of unavoidable noncompactness

---

**10.** Earlier New York cases are generally consistent with the *Thompson* and *Schneider* cases. *See In re Richardson*, 307 N.Y. 269, 121 N.E.2d 217 (1954); *In re Dowling*, 219 N.Y. 44, 113 N.E. 545 (1916); *In re Sherrill*, 188 N.Y. 185, 81 N.E. 124 (1907).

**11.** A later Pennsylvania case is in accord with *Specter*. *See In re Reapportionment Plan for Penna. Gen'l Assembly*, 497 Pa. 525, 442 A.2d 661 (1981).

would be present in some apportionment schemes because of uneven population densities, the need for population equality among districts, and the desire to preserve natural boundaries; and that consequently district lines might not be aesthetically pleasing models of geometric compactness. *Id.* at 426.[12] The court in *Davenport v. Apportionment Comm'n,* 65 N.J. 125, 319 A.2d 718 (1974), described compactness as an "elusive concept," one of limited utility in view of the overriding goal of substantial equality of population, and the irregularity and odd configurations of the state's boundaries and the boundaries of its political subdivisions.[13]

A more precise definition of compactness was attempted in *Acker v. Love,* 178 Colo. 175, 496 P.2d 75 (1972), involving a state constitutional requirement that districts be "as compact in area as possible." The court said that, as used in the Colorado Constitution, compactness was concerned with "a geographic area whose boundaries are as nearly equidistant as possible from the geographic center of the area being considered, allowing for variances caused by population density and distribution, census enumeration districts, and reasonable variations necessitated by natural boundaries and by county lines." *Id.,* 496 P.2d at 76. In a later Colorado case, *In re Interrogatories by Gen'l Assembly,* 178 Colo. 311, 497 P.2d 1024 (1972), the court held that there had been "substantial compliance" with the compactness requirement where consideration was given to the "geography of the state, population concentrations and their location, the various sizes and shapes of census enu-

**12.** Earlier Missouri cases are in accord with *Thompson* and *Preisler v. Kirkpatrick, supra. See, e.g., Preisler v. Doherty,* 365 Mo. 460, 284 S.W.2d 427 (1955); *State ex rel. Davis v. Ramacciotti,* 193 S.W.2d 617 (Mo.1946); *State ex rel. Barrett v. Hitchcock,* 241 Mo. 433, 146 S.W. 40 (1912).

**13.** Earlier New Jersey cases are consistent with *Davenport. See Schrimminger v. Sherwin,* 60 N.J. 483, 291 A.2d 134 (1972); *Jackman v. Bodine,* 49 N.J. 406, 231 A.2d 193 (1967).

meration districts, and the absence of census blocks in many instances, plus the various sizes and shapes of counties, all [of which] militate against one particular or ideal solution to the reapportionment problem." 497 P.2d at 1025.

The cases generally recognize that the compactness requirement is subservient, in application, to the dominant federal constitutional requirement of substantial equality of population among districts.[14] *See, e.g., Schneider, Davenport, Barrett* and *Grivetti,* all *supra.* As indicated, the cases also recognize that the compactness requirement must be applied in light of, and in harmony with, the other legitimate constraints which interact with and operate upon the constitutional mandate that districts be compact in form. Thus, it cannot ordinarily be determined by a mere visual examination of an electoral map whether the compactness requirement has been violated, *Specter, Richardson* and *Dowling,* all *supra,* although in some instances involving districts of extremely irregular size or shape a glance at the districting map may permit the conclusion that a district is not constitutionally compact. *See Schrage, supra.* The cases hold that compliance with the state constitutional compactness requirement is mandatory; indeed, a number of jurisdictions have found legislative districts to be unconstitutional for failure to observe the compactness standard. *See, e.g., In re Legislative Districting of Gen'l Assembly,* 193 N.W.2d 784 (Iowa 1972); *Acker, Thompson, Barrett,* and *Preisler v. Doherty,* all *supra.* On the other hand, the cases also recognize that it is not for the judiciary to determine whether a more compact district could have been drawn than that under challenge; the court's province is solely to determine whether the principles underlying the requirement of compactness of

---

14. In view of the Supremacy Clause of the Federal Constitution, Article VI, and Article 2 of the Maryland Declaration of Rights, the federal constitutional requirement of population equality in the districting process is the preeminent constraint on the compactness provision of § 4 of Article III of the Maryland Constitution.

territory have been considered and properly applied considering all relevant circumstances. *See, e.g., Schneider, Davenport, Opinion to the Governor* and *Thompson,* all *supra.*

 The provision of § 4 of Article III of the Maryland Constitution that "[d]ue regard shall be given to natural boundaries and the boundaries of political subdivisions" is integrally related to the compactness and contiguity requirements; all involve the physical configuration of district lines.[15] The primary intent of the "due regard" provision is to preserve those fixed and known features which enable voters to maintain an orientation to their own territorial areas. Like compactness and contiguity, the "due regard" requirement is of mandatory application, although by its very verbiage it would appear to be the most fluid of the constitutional components outlined in § 4.

Thus it is that the state constitutional requirements of § 4 work in combination with one another to ensure the fairness of legislative representation. That they tend to conflict in their practical application is, however, a plain fact, viz, population could be apportioned with mathematical exactness if not for the territorial requirements, and compactness could be achieved more easily if substantially equal population apportionment and due regard for boundaries were not required.

## III

## ALLEGED FEDERAL CONSTITUTIONAL VIOLATIONS

### (A)

### Population Apportionment

 Only Petitions Nos. 6 (Baltimore County) and 7 (Southern Maryland) challenge districts on the ground that

---

**15.** We construed incorporated municipalities as being "political subdivisions" within the contemplation of § 4 in *In re Legislative Districting,* 271 Md. 320, 317 A.2d 477 *cert. denied sub. nom. Twilley v. Governor of Md.,* 419 U.S. 840, 95 S.Ct. 70, 42 L.Ed.2d 67 (1974).

they are not of substantially equal population. As to the former petition, the goal underlying enactment of H.J.R. 32 of having no deviation from the ideal population greater than 10 percent (± 5) was plainly achieved and the districts are therefore well within the permissible limits for state legislative districts permitted by *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), as found by the Special Master. *See also Brown v. Thomson*, —— U.S. ——, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983).

■■■ As to Petition No. 7, there is a disparity between Subdistricts 29B and 29C of + 6.69 and – 6.13 from the mean, respectively. While this disparity might have been eliminated or reduced by combining these two districts into a single two-member district, as maintained by the petitioner, the disparity is within the tolerance permitted by *Mahan* under the federal equal protection clause.[16] In this regard, we note that the districting in the Southern Maryland area took into account the obvious need to maintain contiguity of territory in order to preserve constituent-representative communication. Moreover, the districting process in this area was complicated by uneven concentrations of population on a land area divided by unbridged waters and contained by an intricate, uneven shoreline. Of several alternatives considered, the districting plan, as ultimately adopted, avoided dividing districts between unbridged waters, albeit at a cost of slightly increased unequal apportionment between the two subdistricts. However, as required by *Reynolds v. Sims, supra,* and within the formulation of *Mahan*, we agree with the Special Master that as to the districts challenged in Petition No. 7, H.J.R. 32 represents an honest and good faith effort to construct districts as

---

**16.** *Mahan* teaches that so long as divergence from a strict population standard is based on legitimate considerations incident to the effectuation of a rational state policy, a deviation from the equal population principle is permissible (16% deviation approved in *Mahan* ).

nearly of equal population as was practicable in the circumstances.[17]

## (B)
## Invidious Discrimination

■■■ As already indicated, eight petitions challenged districts for varying reasons as being invidiously discriminatory in violation of the equal protection clause of the fourteenth amendment, *i.e.*, (1) as to Petitions Nos. 2, 3 and 5, that the districts diluted the voting strength of residents of incorporated municipalities and an unincorporated town; (2) as to Petitions Nos. 2 and 5, that the districts were drawn to protect incumbents by assuring that not more than one incumbent senator or three incumbent delegates were placed in any single district; (3) as to Petitions 3, 4, 8, 9 and 11, that the districts diluted the voting strength of blacks and political minority groups, and (4) as to Petitions 3, 4, 8, 9, 10 and 11, that the voting strength of discrete groups was otherwise diluted by utilizing multimember districts and by dividing "communities of interest." We agree with the Special Master's conclusion that there is no merit in any of these claims.

There is nothing in the record even remotely suggesting that the districts in H.J.R. 32 were conceived as a purposeful device to further racial or other invidious forms of discrimination. The petitioners did not, therefore, carry the strong burden imposed upon them under the cited Supreme Court cases to support their claims of invidious discrimination and, accordingly, their claims must fail.

■■■ More specifically, however, Petitions 2 and 5 challenged the inclusion in District 17 (Montgomery County) of the incorporated municipalities of Rockville and Gaithers-

---

**17.** The petitioner in No. 7 did not contend before us that the claimed population disparity violated the state constitutional provision in § 4 of Article III for substantial equality of population among districts. We, therefore, do not consider whether the state constitutional requirement is more stringent than the federal constitutional requirement.

burg. The evidence showed that Rockville has a population of 43,000, that Gaithersburg's population is 26,000 and that the statistically ideal district population is 89,723. Neither municipality, therefore, possessed the population required for a single district. It is equally clear that the respective northern-southern boundaries of these municipalities are separated in part by a narrow corridor, with a common boundary in one precinct of the district. The joinder of the two municipalities within a single district gave consideration to the municipal boundaries of each and additional population was added from adjoining areas to comprise the balance of the district, bringing it within 2.56% of the statistically ideal district population.

The petitioners' claim of debasement of the voting strength of the residents of the two municipalities appears, in reality, predicated upon the notion that, if in separate districts, they would possess greater influence over their legislative representatives than if joined within a single district. As we see it, the residents have no right, constitutional or otherwise, to placement in different districts in order that their voting strength may be maximized at the expense of other voters within the county.

 Along similar lines, the petitioner in No. 3 (Howard County) complained of the division of the unincorporated Town of Columbia so that some of its "villages" were placed in District 13 (comprising residents of Howard and Prince George's Counties) while others were included in District 14 (comprising residents of Howard and Montgomery Counties).[18] Howard County's population of 118,572, however, prohibited retention of the county's boundaries within a single district. It is readily apparent that in the formulation of Districts 13 and 14 H.J.R. 32 gave consideration to the interests of population groups in and around the municipal boundaries of Laurel, as well as those within

---

**18.** A small number of Howard County residents were placed in District 4B with residents of Carroll County.

unincorporated Columbia. The competing interests were resolved in H.J.R. 32 by dividing unincorporated Columbia along a major highway between the two districts. Under the Plan, District 13 was formulated with a population variance. of only 2.4% from the statistically ideal while District 14's population variance was 4.9%. We think it obvious that the construction of these districts had a rational purpose, and there is no indication that the division of residents within Columbia was invidiously calculated to dilute their voting strength.

■ Nor is there evidence to support the claim of invidious discrimination asserted in Petitions 2 and 5 that District 17 (Montgomery County) and others were drawn to unfairly protect incumbent delegates and senators. At most, the record shows that the challenged districts were drawn so as to minimize contests between incumbents; but this, without more, does not mandate a finding of invidious discrimination in the districting process. Indeed, a politically fair consideration of incumbency in the redistricting process does not offend the constitution, absent a showing that the districts were unfairly fashioned to favor or hinder either incumbents or nonincumbents. It is incongruous in our view to profess the virtues of constituent-representative communication while at the same time condemning the practice of permitting the voters to decide whether an incumbent is to continue as an elected representative. *See Burns v. Richardson, supra,* 384 U.S. at 89 n. 16, 86 S.Ct. at 1295 n. 16. *See also White v. Weiser,* 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); *Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973).

■ Those petitions which claimed dilution of voting strength of blacks or minority political groups in Howard County, Baltimore City and in the southern Eastern Shore Counties are wholly unsubstantiated by evidence. Indeed, there is nothing in the record to show a discriminatory effect by reason of any of the challenged districting or, if there was such an effect, that it was intended to be invidi-

ously discriminatory. As already observed, the controlling Supreme Court cases make it clear that a claim of invidious discrimination cannot be sustained in the absence of supporting evidence (and there is none here) that the political processes leading to election were not equally open to those challenging the districting plan on constitutional grounds.[19]

Nor is there anything in the record to show that H.J.R. 32, by utilizing multimember districts, sought to minimize or cancel out the voting potential of any racial or political group.[20] And neither was there substantiation of the bare allegations in some petitions that "communities of interest" were divided in the districting process for intentionally discriminatory purposes.[21]

## IV

### ALLEGED STATE CONSTITUTIONAL VIOLATIONS

#### (A)

#### Compactness

Petitions Nos. 2, 4, 5, 6, 7 and 9 allege violations of the compactness requirement of the State Constitution, the principal challenges being against District 17 in Montgomery County and District 44 in Baltimore City. See Appendix A. In addition, an amicus curiae brief submitted by the

---

**19.** The Special Master's finding that District 44 in Baltimore City was unconstitutional as drawn was based on his view that the district was not compact, although he gave some indication that a better racial equality could be achieved if his suggested alteration of the district's boundaries was adopted.

**20.** *Compare White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), where the Supreme Court struck down a legislative district as being invidiously discriminatory based on a clear evidentiary showing that there was a racially discriminatory purpose in constructing a multimember district.

**21.** Communities of interest, in the sense contemplated by the petitioners, would appear to be identifiable concentrations of population which share one or more common interests.

Mayor and City Council of Rockville urged that District 17 was unconstitutionally noncompact.

In considering the validity of these challenges, we note at the outset that Maryland's straight line borders to the north (Pennsylvania), to the west (West Virginia) and to the east (Delaware) are joined by a southern border of contorted convolutions, giving the State a bizarre geographic configuration. The State's westernmost counties are almost severed from the rest of the State by the protruding northeast boundary of West Virginia; the easternmost counties are severed by the waters of the Chesapeake Bay; and the southwest border is warped by the winding waters of the Potomac River. The State's internal structure is further fragmented by numerous other rivers, water bodies and topographic irregularities. Clearly, the State's geography inhibits the geometric fashioning of districts of symmetrical compactness and it was hardly the purpose of the compactness requirement to promote aesthetically pleasing district configuration forms. We therefore think it obvious that a mathematical formulation for determining whether a particular district is unconstitutionally noncompact was not within the contemplation of the constitutional framers when proposing adoption of § 4 of Article III of the Maryland Constitution.

As the cases so plainly indicate, the compactness requirement in state constitutions is intended to prevent political gerrymandering. Oddly shaped or irregularly sized districts of themselves do not, therefore, ordinarily constitute evidence of gerrymandering and noncompactness. On the contrary, an affirmative showing is ordinarily required to demonstrate that such districts were intentionally so drawn to produce an unfair political result, that is, to dilute or enhance the voting strength of discrete groups for partisan political advantage or other impermissible purposes. Thus, irregularity of shape or size of a district is not a litmus test proving violation of the compactness requirement.

We are essentially in agreement with those cases which view compactness as a requirement for a close union of territory (conducive to constituent-representative communication), rather than as a requirement which is dependent upon a district being of any particular shape or size. Of course, in determining whether there has been compliance with the mandatory compactness requirement, due consideration must be afforded, as the cases almost uniformly recognize, to the "mix" of constitutional and other factors which make some degree of noncompactness unavoidable, *i.e.*, concentration of people, geographic features, convenience of access, means of communication, and the several competing constitutional restraints, including contiguity and due regard for natural and political boundaries, as well as the predominant constitutional requirement that districts be comprised of substantially equal population. As to compliance with the compactness requirement, as with compliance with the other constitutional criteria, H.J.R. 32 enjoys a presumption of validity, and it is not the province of the judiciary to strike down a district as being noncompact simply because a more geometrically compact district might have been drawn. Essentially, the districting process is a political exercise for determination by the legislature and not the judiciary; the function of the courts is limited to assessing whether the principles underlying the compactness and other constitutional requirements have been fairly considered and applied in view of all relevant considerations.

The Special Master found, and we agree, that the Montgomery County districts, including District 17, are in compliance with the compactness requirement of the State Constitution. In addition to containing the municipalities of Rockville and Gaithersburg, District 17 (See Appendix A1) includes a finger-like appendage to the south of Rockville, giving the district a shape which the petitioners assail as lacking in compactness. The challenged portion of District 17 contains sufficient population, in addition to that within the two municipalities, to bring the district into compliance

with the constitutional requirement of substantially equal population apportionment. One petition, in faulting this configuration, urges that a more compact district could have been achieved if the needed population had been obtained from the north of Gaithersburg rather than from the south of Rockville. Another petition suggests that the additional population requirement should have been satisfied by looking to the west of Rockville. That these suggestions, if implemented, might have achieved a greater measure of geometric compactness only begs the question of whether the district, as actually drawn, violates the compactness requirement. The petitioners champion various objective measurements of shape as determinative of compactness, while largely ignoring the principle that a degree of noncompactness is unavoidable. We think the petitioners, in urging their shape analysis upon us, have lost sight of the fact that considerations other than compactness are involved in shaping each individual district, as well as in the overall districting process.

In arguing that District 17 is fatally noncompact, the amicus Rockville places special reliance upon *Schrage v. State Board of Elections*, 88 Ill.2d 87, 58 Ill.Dec. 451, 430 N.E.2d 483 (1981). That case involved a challenge to a state legislative district of extremely irregular size, running in excess of 125 miles through 20 townships, 6 counties, parts of 4 congressional districts, 2 Appellate Court districts, and 5 formerly apportioned state delegate districts. The district was not served by either a single common television station or by a single common newspaper. The court in *Schrage* found the district to be noncompact, not because of its shape but because of its unwieldy size, stating, "The creation of a representative district which is extremely elongated and not 'closely united' significantly impedes vital constituent-representative communication, thus preventing the achievement of a legislative process which is, in fact, representative." 430 N.E.2d at 489.

District 17 is but a fraction of the size of the district involved in *Schrage* and we see no parallel between the two districts. Moreover, we note that District 17 is widest at its center, while the district condemned in *Schrage* was most narrow at its center (typical of the so-called dumbbell shape).

As to the Baltimore City districts, the Special Master concluded that there was no violation of the compactness requirement, except as to District 44. In his report, he observed that under H.J.R. 32 Baltimore City was divided into nine districts of substantially equal population; that the city was intentionally districted to reasonably assure four white and four black majority districts, with District 44 being a "swing" district in which the black-white population was substantially equal; that precincts 39 and 40 had been excluded from District 44 and placed in District 43, which had an 80 percent white population; that the placement of these two precincts thereby excluded the predominantly black Morgan State University community from "swing" District 44; and that the exclusion of these two precincts from District 44 was accomplished by "cutting a wide swath from the northern outline of the District and by adding a boot-like appendage to its southeast corner." The Special Master recommended altering Districts 43 and 44 by moving three precincts from District 44 to District 43 and compensating for the loss of that population by adding precincts 39 and 40, and three others, from District 43 to District 44. The recommended change, the Special Master said, "produces improved configuration of both Districts; and promotes a better racial equality in the 'swing district' . . . ."

District 44 (see Appendix A2) is undoubtedly the most irregularly shaped of any of the challenged Baltimore City districts. The Special Master's finding of noncompactness as to this district appears based on his belief that the district's odd shape was attributable, in some part at least, to an invidious racial motivation—a finding with which we have already expressed disagreement, in that there was no

evidence that any racial group was invidiously denied its fair share of representation. Indeed, the population in the precinct that includes Morgan State University actually consists of more whites than blacks, hardly an indicia of invidious discrimination.

We find no violation of the compactness requirement in any of the city's districts. Like the State itself, the straight line north, east and west boundaries of Baltimore City are connected by an extremely ragged southern boundary resulting from the interdiction of navigable waters so essential to the city's life. This circumstance alone is a constraint upon formulation of districts of simple geometric design.

The 1980 census disclosed that Baltimore City's population had declined in relation to the population of the State as a whole. As a result, the city's eleven districts were reduced to nine. It having been decided that the geographic borders of the city should remain intact in the redistricting process, a massive reorganization of district lines was essential and the districts were drawn with an average population within 2.5 percent of the statistically ideal.[22] Since Baltimore City would thereby lose two seats in the Senate and six seats in the House of Delegates, the rational goal of avoiding additional loss of senior legislators by reducing the number of contests between incumbents was adopted, as was the legitimate achievement of racial balance among the nine districts. *See United Jewish Organizations v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). Necessarily these goals required careful adjustment of district lines and resulted in some sacrifice of ideal geometric compactness and due regard for natural boundaries, although the requirement for substantial equality of

---

**22.** H.J.R. 32's maintenance of the city's boundaries represents a continuation of a long practice of preserving the city's integrity as a discrete and insular jurisdiction—a practice which cannot be faulted on constitutional grounds so long as it does not impair equality in apportionment, or violate principles of compactness and contiguity or disregard natural or political boundaries.

population among the districts was in no way compromised. We thus conclude that the legislature, in adopting H.J.R. 32, did construct districts in Baltimore City, all of which were "compact in form" in the light of the constraints upon geometric form imposed by other constitutional commands and the geography of the city itself.

 Size as an element of compactness is involved in the challenge to District 29 (see Appendix A). While that district extends approximately one-half of the length of Maryland's Western Shore, its size (and shape) results from the generally low density of population in Southern Maryland, as well as its irregular and elongated geographical configuration. The compactness requirement has not, therefore, been ignored in constructing this district but only reconciled with those considerations which naturally counteract ideal compactness.

Finally, we conclude that other challenges based on an alleged lack of compactness are equally without merit.

## (B)

### Due Regard for Boundaries

All but one petition raised questions as to compliance with § 4's requirement that due regard be given to "natural boundaries" and the boundaries of "political subdivisions." In this regard, some of the petitions have argued the issue in the context of a disregard of "communities of interest" in the districting process. The Special Master found no merit in any of the claims. Nor do we after careful consideration of the claims made in the various petitions.

 The "due regard" provision, as we have heretofore explained, seeks to preserve well-recognized boundary lines to aid voters in orienting themselves to the territory of their districts. The provision does not, in our view, encompass protection for a concept as nebulous and unworkable as "communities of interest," involving as it does concentrations of people sharing common interests. We think it

apparent that the number of such communities is virtually unlimited and no reasonable standard could possibly be devised to afford them recognition in the formulation of districts within the required constitutional framework.

## (C)

### Public Hearings

There is no merit to the contention raised in Petition No. 10 that the public hearing requirement of § 5 of Article III of the Maryland Constitution was violated in this case. On the contrary, the record discloses that numerous public hearings were conducted by the Governor's Advisory Committee throughout the State, as well as two such hearings personally conducted by the Governor to receive comment on the recommended Plan before its final adoption.

We conclude that H.J.R. 32 complies with all provisions of the Federal and State Constitutions and is affirmed as enacted by the General Assembly.

APPENDIX A

Maryland Legislative Districts
February 26, 1982

## APPENDIX A 1

### Washington Metropolitan Area Legislative Districts

## APPENDIX A 2
### Baltimore City Legislative Districts

