**MARYLANDERS FOR FAIR REPRESENTATION, INC., et al., Plaintiffs,**

v.

**William Donald SCHAEFER, et al., Defendants,**

**NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE, INC., et al., Plaintiffs,**

v.

**William Donald SCHAEFER, et al., Defendants.**

**Civ. A. Nos. S–92–510, S–92–1409.**

United States District Court, D. Maryland.

April 5, 1994.

---

David D. Queen, Ober, Kaler, Grimes and Shriver, Baltimore, MD, for William Bergeron and Louis J. Tiches.

Samuel L. Walters, Asst. Gen. Counsel, Dennis C. Hayes, Gen. Counsel, N.A.A.C.P.

Special Contribution Fund, Baltimore, MD, for N.A.A.C.P., Inc.

Robert A. Zarnoch, Atty. General's Office, Annapolis, MD, Dawna M. Cobb, Office of Atty. Gen., Diane Krejsa, Law Office, Lucy A. Cardwell, Office of Gen. Counsel, Carmen M. Shepard, J. Joseph Curran, Jr., Office of Atty. Gen., Baltimore, MD, Kathryn M. Rowe, Office of Atty. Gen., Linda H. Lamone, Annapolis, MD, Evelyn O. Cannon, Law Office, Baltimore, MD, for William Donald Schaefer, State Administrative Bd. of Election Laws, William M. Kelly, Jr., Thomas V. Miller, Jr., R. Clayton Mitchell, Jr., James W. Johnson, Jr., and Gene M. Raynor.

Before MURNAGHAN, Circuit Judge, and MOTZ and SMALKIN, District Judges.

## MEMORANDUM OPINION

### PER CURIAM.

In a previous opinion of this three-judge District Court, the majority held that the 1992 redistricting plan for the Maryland General Assembly impaired the opportunity of black voters on the Eastern Shore to participate in the political process and to elect representatives of their choice, and therefore violated § 2 of the Voting Rights Act of 1965, 79 Stat. 437, as amended, 42 U.S.C. § 1973. We ordered the State to prepare a new redistricting plan to cure that violation. The State timely submitted a proposed remedial plan, which we now approve.

### I

In our Opinion and Order of January 14, 1994, we directed the State of Maryland to prepare and submit to the Court a new redistricting plan that satisfied two requirements: (1) it must create on the Eastern Shore a single-member delegate district with a majority-black voting-age citizen population; and (2) it must comply with the Constitution of the United States, with the Voting Rights

Act, and with the Constitution and laws of the State of Maryland. *See Marylanders for Fair Representation, Inc. v. Schaefer,* 849 F.Supp. 1022, 1064 (D.Md.1994).

On February 28, the State submitted a new redistricting plan that somewhat altered the boundaries of senate District 37 and then subdivided it into a single-member delegate District 37A[1] and a two-member, at-large delegate District 37B. According to the 1990 census, District 37A contains 32,578 people, 57.3% of whom are black. Of its 23,588 residents of voting age, 54.6% are black. Thus, the State's proposed remedial plan clearly complies with the first requirement of our previous Order: it creates on the Eastern Shore a single-member delegate district with a majority-black voting-age citizen population.

The State's proposed two-member delegate district (District 37B), however, raises a question as to the second requirement of our Order: whether it complies with the constitutional principle of population equality (*i.e.,* "one person, one vote"). *See* U.S. Const. amend. XIV, § 1; Md. Const. art. III, § 4. It is to that question that we now turn.[2]

### II

As an initial matter, we recognize that our task here is a limited one. Having already established a violation of the Voting Rights Act and ordered the State to create a new redistricting plan, we "may *only* consider whether the proffered remedial plan is legally unacceptable because it violates anew constitutional or statutory voting rights." *McGhee v. Granville County,* 860 F.2d 110, 115 (4th Cir.1988) (emphasis added). If the proposed remedial plan meets the applicable constitutional and legal standards, we "must then accord great deference to [the State's] judgments about the exact nature and scope

---

**1.** The State's proposed District 37A represents a slight variant of the NAACP plaintiffs' proposed "District 54–9," discussed in our earlier opinion. *See Marylanders for Fair Representation,* 849 F.Supp. at 1050–51.

**2.** The Court gave all plaintiffs the opportunity to submit comments on the State's proposed reme-

dial plan. Only the NAACP plaintiffs responded. They recommended some "minor fine-tuning" to address the population equality problem, but lodged no formal objection to the State's proposal.

of the proposed remedy, reflecting as it will a variety of political judgments about the dynamics of an overall electoral process that rightly pertain to the legislative prerogative of the State." *Id.* (citing, *inter alia, White v. Weiser,* 412 U.S. 783, 795, 93 S.Ct. 2348, 2355, 37 L.Ed.2d 335 (1973)).

### III

 District 37B in the State's proposed remedial plan contains 74,220 people, a + 9.4% deviation above the ideal population for a two-member delegate district. When that deviation is coupled with the − 5.4% deviation for delegate District 2A, the total deviation of the proposed redistricting plan rises to 14.8%. Because the total deviation in the new plan containing District 37B exceeds ten percent, the State bears the burden of demonstrating that the plan may reasonably be said to advance rational state policies. *See Voinovich v. Quilter,* —— U.S. ——, ——, 113 S.Ct. 1149, 1159, 122 L.Ed.2d 500 (1993); *Brown v. Thomson,* 462 U.S. 835, 842–43, 103 S.Ct. 2690, 2695–96, 77 L.Ed.2d 214 (1983); *Mahan v. Howell,* 410 U.S. 315, 328, 93 S.Ct. 979, 987, 35 L.Ed.2d 320 (1973); *Reynolds v. Sims,* 377 U.S. 533, 578–79, 84 S.Ct. 1362, 1390–91, 12 L.Ed.2d 506 (1964); *see also Karcher v. Daggett,* 462 U.S. 725, 740–44, 103 S.Ct. 2653, 2663–67, 77 L.Ed.2d 133 (1983) (listing several rational state policies that may justify deviations from population equality).[3]

 To make the proposed plan's districts more nearly equal in population, the State would have to shift territory containing several thousand people out of District 37B and into one or more of the adjoining delegate districts—District 37A (the new single-member majority-black district), District 36 to the north, or District 38 to the east. *See Marylanders for Fair Representation,* 849 F.Supp. at 1050–51 n. 34 & 1055 n. 47 (warning that District 37B "would be slightly too large for a two-member district" unless parts of it were shifted to District 37A, 36, or 38).[4]

The State opposes shifting territory and population from District 37B into District 37A on the ground that doing so would dilute the strength of black voters in the latter district and would significantly diminish their opportunity to elect a Delegate of their choice. The very purpose of our previous Opinion and Order would be undermined. Thus, we find that the State's decision not to tamper with the boundary between Districts 37A and 37B advances the rational state policy of protecting the voting strength of racial minority groups. *See Anne Arundel County Republican Cent. Comm. v. State Admin. Bd. of Election Laws,* 781 F.Supp. 394, 398 (D.Md.1991) (three-judge court), *aff'd,* —— U.S. ——, 112 S.Ct. 2269, 119 L.Ed.2d 197 (1992).

 The State also is opposed to shifting territory and population from District 37B into District 36. Under the State's proposed remedial plan, most of the residents of Caroline and Talbot Counties live in District 37B and the rest live in District 36. The State contends that shifting additional parts of Caroline County out of District 37B would deny that county's residents a fair chance of elect-

---

3. Because the population equality standard under the United States Constitution is at least as strict as that imposed by the Maryland Constitution, we apply the former. *See Legislative Redistricting Cases,* 331 Md. 574, 600–01, 629 A.2d 646, 659 (1993). Under the federal constitutional standard, in addition to showing that the plan may reasonably be said to advance rational state policies, the State must demonstrate that the plan's total population deviation does not exceed constitutional limits. That requirement is met here, as the total deviation is only 14.8%. The Supreme Court has previously approved a state legislative redistricting plan with a total deviation in excess of sixteen percent, *see Mahan,* 410 U.S. at 329, 93 S.Ct. at 987, and Maryland's 1982 legislative districting plan had a total devia-

tion of more than fifteen percent, yet it withstood a population equality challenge in the Maryland Court of Appeals. *In re Legislative Districting,* 299 Md. 658, 682–83, 475 A.2d 428, 440, *appeal dismissed,* 459 U.S. 962, 103 S.Ct. 286, 74 L.Ed.2d 272 (1982).

4. Because the Maryland Constitution provides that each legislative district shall elect one Senator and three Delegates, and that the Delegates' districts must be "nested" in, or coterminous with, the Senator's district, *see* Md.Const. art. III, § 3, either of the last two options would involve changing the boundaries of senate, as well as delegate, districts.

ing a candidate from Caroline County to either the House of Delegates or the Senate. The State makes a similar argument against shifting additional parts of Talbot County out of District 37B and into District 36.[5]

In our earlier opinion, we concluded that the State has a rational, legitimate interest in maximizing the number of counties that are represented in the state legislature by at least one county resident. *Marylanders for Fair Representation,* 849 F.Supp. at 1063. If either Caroline or Talbot County is to be represented in Annapolis by one of its own residents, it will likely have to elect a Senator from District 37 or a Delegate from District 37B. Neither county would be likely to elect a resident Delegate or Senator from District 36 because—even if several thousand additional Caroline or Talbot County residents were shifted into District 36—neither county would constitute as much as ten percent of that district's voting population. By keeping the lion's share of both counties in delegate District 37B (and thereby in senate District 37), the State has attempted to protect each county's potential for representation in Annapolis.[6] Therefore, we find that the State's refusal to shift part of either Caroline or Talbot County out of District 37B and into District 36 was "based on legitimate considerations incident to the effectuation of a rational state policy." *Reynolds,* 377 U.S. at 579, 84 S.Ct. at 1391.[7]

■ Finally, the State is opposed to shifting territory and population from District 37B into District 38. As drawn in the State's proposed remedial plan, the line separating Districts 37B and 38 runs through Wicomico County, from the municipal boundary of the City of Salisbury north to the Maryland–Delaware border. The State contends that excising from District 37B the part of Wicomico County that lies immediately to the west of that line would diminish Wicomico County's chances of electing a Senator from District 37. That problem, explains the State, is not merely a theoretical one. If the State's remedial plan is approved, Samuel Q. Johnson, III, who is currently the District 37 Delegate from western Wicomico County, will run for the District 37 Senate seat that will be open as a result of Senator Frederick C. Malkus's retirement. The State intimates that, if its proposal were not approved and three or four thousand of Wicomico County's thirty thousand District 37 residents had to be shifted into District 38, Johnson might *not* run for the Senate. Instead, the State informs us, Johnson would run for reelection to the House of Delegates. Because he resides within the borders of the newly-created, majority-black delegate District 37A, Johnson's reelection bid would in all probability pit a twelve-year veteran of the House of Delegates, who is white, against a black challenger in the 1994 Democratic primary. The State, relying on *Anne Arundel County,* 781 F.Supp. at 398, contends that enabling a black candidate in a newly-created, majority-black district to run without the presence of a white incumbent is a legitimate state interest justifying District 37B's relatively large population. We agree.

Moreover, we believe that the electoral calculations described above are precisely the sort of political judgments best left to the

---

5. With regard to the House of Delegates, the State's argument for Talbot County has considerably less force. Even if several thousand residents of Talbot County were shifted from District 37B into District 36, the county would still contribute more voters to District 37B than Dorchester or Wicomico County (and almost as many as Caroline County). Therefore, Talbot County would retain a fair chance of electing a Delegate from District 37B.

6. Under the districting plan that has been in effect since 1982, District 37 elects three Delegates at-large; currently, one of the incumbent Delegates is from Caroline County and another is from Talbot County.

7. The State also contends that adding additional parts of Caroline or Talbot County to District 36 might jeopardize the reelection prospects of that district's incumbent Senator, who is the Eastern Shore's only standing senate committee chair. *See White v. Weiser,* 412 U.S. at 791, 93 S.Ct. at 2352–53 (recognizing a rational state policy "aimed at maintaining existing relationships between incumbent[s] and their constituents and preserving the seniority the [former] have achieved"); *Anne Arundel County,* 781 F.Supp. at 398 (same).

duly elected officials of the State, not to the federal judiciary. As Justice White admonished us more than two decades ago, we should not be deterred from entering the political thicket of redistricting when fundamental democratic rights are at stake, but we must steadfastly avoid "becom[ing] bogged down in a vast, intractable apportionment slough, particularly when there is little, if anything, to be accomplished by doing so." *Gaffney v. Cummings,* 412 U.S. 735, 750, 93 S.Ct. 2321, 2330, 37 L.Ed.2d 298 (1973). Today, we heed his words.

## IV

Accordingly, we hold that the State's proposed remedial legislative redistricting plan satisfies all applicable constitutional and legal standards, federal and state. Therefore, we approve the plan and order the defendants to adopt and implement it as soon as practicable. A separate order effecting the ruling made in this opinion is being entered herewith.

## *ORDER*

For the reasons stated in the opinion entered herein, it is, this 5th day of April, 1994

ORDERED

1. That the State's proposed remedial redistricting plan for the Maryland General Assembly, as submitted to the Court on February 28, 1994, is approved;

2. That the defendants are directed to adopt and implement the State's proposed remedial redistricting plan for the Maryland General Assembly, as submitted to the Court on February 28, 1994, as soon as practicable;

3. That the taxable costs of this suit under 28 U.S.C. § 1920 will be determined by the Clerk of the Court, and that the parties will bear their own costs;

4. That this is a final judgment pursuant to Rule 54 of the Federal Rules of Civil Procedure, disposing of all counts and claims submitted by all parties; and

5. That this case BE, and it hereby IS, CLOSED.

APPENDIX

# 1992 GOVERNOR'S LEGISLATIVE DISTRICT PLAN

## Revised Eastern Shore Districts, Feb., 1994

SMALKIN, District Judge, concurring and dissenting.

I have no quarrel with the majority's acceptance of the State's new redistricting plan, submitted in response to the majority's holding that the original plan violated the Voting Rights Act. For this reason, I concur in that portion of the Court's opinion. Because I continue to be of the view that the defendants, rather than the plaintiffs, are entitled to judgment on the merits as to the Voting Rights Act claim, I respectfully dissent from the judgment of the Court pertaining to the Voting Rights Act claim in this litigation.