ANNE ARUNDEL COUNTY REPUB-
LICAN CENTRAL COMMITTEE,
et al., Plaintiffs,

v.

The STATE ADMINISTRATIVE BOARD
OF ELECTION LAWS, et al.,
Defendants.

Civ. A. No. S 91–3200.

United States District Court,
D. Maryland.

Dec. 23, 1991.

John R. Greiber, Jr., Law Office, Annap-
olis, Md., for plaintiffs.

Evelyn O. Cannon, Asst. Atty. Gen., Bal-
timore, Md., Robert A. Zarnoch, Kathryn
M. Rowe, Asst. Attys. Gen., Annapolis,
Md., James C. Praley, Lessans & Tate,
Glen Burnie, Md., for defendants.

Before NIEMEYER, Circuit Judge,
SMALKIN, District Judge, and FRANK A.
KAUFMAN, Senior District Judge.

## MEMORANDUM OPINION

### I. INTRODUCTION

The plaintiffs in this case include citizens
residing in Anne Arundel County, Mary-
land, as well as members of both the Re-
publican and the Democratic party central
committees of Anne Arundel County, Ma-
ryland. They object to the congressional
redistricting plan approved by the Mary-
land General Assembly on October 22,
1991, following the 1990 Census. They
filed suit in this court alleging jurisdiction
pursuant to 28 U.S.C. §§ 2284(a), 1331,
1343(3) and (4), and 42 U.S.C. § 1983, and
venue pursuant to 28 U.S.C. § 1391(b).

Pursuant to 28 U.S.C. § 2284(a), a three-
judge court, consisting of Circuit Judge
Paul V. Niemeyer, District Judge Frederic
N. Smalkin, and Senior District Judge
Frank A. Kaufman, was convened by Order
of Chief Circuit Judge Sam J. Ervin, III,
and heard arguments on the plaintiffs' mo-
tion for preliminary injunction and the de-
fendants' motion to dismiss and/or for
summary judgment, as well as on the mer-
its of the case (by agreement of both par-
ties), in open court December 13, 1991.
The Court has considered exhibits received
at that hearing, as well as the parties'
stipulated facts. The Court has also con-
sidered plaintiffs' three page Post–Argu-

ment Summary, delivered to this Court on December 16, 1991.

This case having been submitted to the Court for determinations of fact and law, we now proceed to state our findings of facts and conclusions of law.

## II. FACTUAL BACKGROUND

The population of Maryland was determined by the 1990 Census to be 4,781,468. As a result, Maryland was assigned eight seats in the United States House of Representatives, the same number as it had based on the 1980 Census. Thus, the ideal congressional district would now contain 597,683.5 people.

In May, 1991, the Governor of Maryland appointed a Redistricting Advisory Committee. The task of this committee was to make recommendations on any boundary changes for legislative and congressional election districts made necessary by shifts in Maryland's population, as indicated by the 1990 Census results. This the committee did, in a plan issued in August, 1991.

The committee soon abandoned this first plan, and approved a second plan on September 19, 1991. The first plan was, however, the basis for a bill introduced in and passed by the Senate of Maryland as Senate Bill 13 on September 25, 1991, the first day of a special session of the state's General Assembly convened for the purpose of redistricting. The committee's second plan was introduced and passed by the House on that same day, as House Bill ("H.B.") 7.

Numerous amendments to these two plans were offered, of which one, a plan offered by Delegate John J. Bishop and designated as H.B. 22, had an overall population deviation of nine people and an average population deviation of 2.49 people. Another alternative plan, H.B. 10, had an overall population deviation of eleven people and an average deviation of four people.

There followed a prolonged legislative process fraught with political and regional give-and-take, at the end of which H.B. 10 was passed by the Senate on October 21, 1991 and by the House on October 22, 1991. Since the time of that plan's introduction, its population deviation had been improved to a maximum of ten people and an average of 2.75 people.[1] The bill was signed into law by the Governor on October 23, 1991, and this lawsuit quickly followed.

The plaintiffs allege that the Maryland General Assembly failed to make a good-faith effort to achieve numerical equality among the eight new congressional districts, and, in fact, that H.B. 10 was adopted with the discriminatory intent to "deprive the plaintiffs of an opportunity to effectively participate in the political process," in violation of their rights under Article 1, § 2 of the United States Constitution. (Plaintiff's Compl., at 19.) The plaintiffs also allege that H.B. 10 represents an unconstitutional "gerrymander." At the heart of the plaintiffs' argument is that Anne Arundel County, the State's fourth most populous county and formerly part of the State's Fourth Congressional District, has been divided by H.B. 10 among four separate congressional districts, thus "diluting" the votes of the residents.

## III. ANALYSIS UNDER KARCHER

 Article I, § 2 of the United States Constitution provides that the members of the House of Representatives will be chosen "by the People of the several States," with equal representation for equal numbers of people. *Wesberry v. Sanders*, 376 U.S. 1, 7–8, 84 S.Ct. 526, 529–30, 11 L.Ed.2d 481 (1963). This Constitutional mandate "means that as nearly as is practicable one

---

1. At trial and for our purposes here, the numerical deviations in H.B. 10 were calculated based upon the Maryland Attorney General's interpretation of the bill, as it should be read in order to correct a drafting error. (*See* State's Mem. of Law at 9–10; Stipulations of Fact 85.) Plaintiffs do not take issue with this reading of the bill. The population deviation in H.B. 10, broken down by congressional district, is as follows:

| District 1 | + 1 |
| District 2 | 0 |
| District 3 | − 3 |
| District 4 | + 7 |
| District 5 | + 1 |
| District 6 | + 5 |
| District 7 | − 3 |
| District 8 | − 1 |

man's vote in a congressional election is to be worth as much as another's." *Id.* Consequently, congressional districts are to be apportioned to achieve "precise mathematical equality." *Kirkpatrick v. Preisler,* 394 U.S. 526, 530–31, 89 S.Ct. 1225, 1228–29, 22 L.Ed.2d 519 (1969).

The Supreme Court's most recent pronouncement concerning Article I's "one person, one vote" requirement is found in *Karcher v. Daggett,* 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983). *Karcher* sets forth a two-part test for considering the legal significance of population deviations in a state legislature's apportionment of congressional districts. First, those challenging a redistricting plan for alleged failure to comply with Art. I, § 2 bear the burden of proving that "the population differences among districts could have been reduced or eliminated altogether by a good-faith effort to draw districts of equal population." *Id.* at 730, 103 S.Ct. at 2658. If the opponents of a redistricting plan "can establish that the population differences were not [unavoidable nor] the result of a good-faith effort to achieve equality," then the burden shifts to the state. In this second step, the state must prove that "each significant variance between districts was necessary to achieve some legitimate goal." *Id.* at 731, 103 S.Ct. at 2658. The State's justification for contested numerical disparities must be made "with particularity." *Id.* at 739, 103 S.Ct. at 2663.

 Here, the defendants argue that the deviation from absolute numerical equality present in H.B. 10 is too trivial to rise to a constitutionally significant level. (State's Mem. in Supp. of State's Opp'n to Mot. for Prelim. Inj. and State's Mot. to Dismiss and/or for Summ. Judgment at 14–15.) Claiming that the variations from absolute equality are "unavoidable," the defendants seemingly contend that H.B. 10 represents a good-faith effort to achieve population equality, satisfying Art. I, § 2, and the first prong of *Karcher,* thus making it

unnecessary for this court to reach the second prong of *Karcher.* In addition, however, the defendants assert that if the second prong of *Karcher* is reached, they have met their burden thereunder.

We disagree with the defendants as to prong one of *Karcher.* While it is true that the deviation herein is very small, *Karcher* specifically holds "that there are no *de minimis* variations which could practically be avoided, but which nonetheless meet the standard of Art. I, § 2 *without justification." Karcher,* 462 U.S. at 734, 103 S.Ct. at 2660 (emphasis added). "Art. I, § 2 ... permits only the limited population variations which are unavoidable despite a good faith effort to achieve absolute equality, *or for which justification is shown." Id.* at 730, 103 S.Ct. at 2658 (quoting *Kirkpatrick,* 394 U.S. at 531, 89 S.Ct. at 1229 (emphasis added)). Justification, however, "belongs more properly to the second level of judicial inquiry ... in which the State bears the burden of justifying the [statistical] differences with particularity." *Id.* 462 U.S. at 739, 103 S.Ct. at 2662 [2]

In the present case, H.B. 10 has an average variance among Maryland's eight congressional districts of 2.75 people, while H.B. 22 has an average variance of 2.49 people. (Stipulations of Fact paras. 77 and 84.) Given the existence of H.B. 22, a plan with a smaller numerical deviation from absolute equality, plaintiffs have proved that H.B. 10's deviations did not result from an unavoidable good faith effort to achieve population equality. Thus, we disagree with defendants and hold that the mathematical variations in this case, even though relatively small, enable plaintiffs to satisfy *Karcher*'s first prong and shift to the State the burden of proving justification under prong two of *Karcher:*

The showing required to justify population deviations is flexible, depending on *the size of the deviations,* the impor-

---

**2.** Recently, a three-judge district court in Illinois, *Hastert v. State Board of Elections,* 777 F.Supp. 634 (N.D.Ill.1991), applied *Karcher* in an Art. I, § 2 congressional redistricting case. The *Hastert* court concluded that, under *Karch-*

er, there is *no* acceptable departure from absolute numerical equality among congressional districts which will insulate a proposed redistricting plan from further scrutiny.

tance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely. By necessity, whether deviations are justified requires case-by-case attention to these factors.

*Karcher,* 462 U.S. at 741, 103 S.Ct. at 2664 (emphasis added).

It is under *Karcher*'s second prong that we now consider the relatively insignificant mathematical deviations in this case. We note that the amount and degree of justification which the State must establish is roughly equatable to the deviation itself. In that light, we consider the aims of the State of Maryland which have caused it to enact the particular congressional redistricting plan before us.

In *Karcher,* Justice Brennan provided guidance for the determination of what state objectives might justify deviations from numerical equality among the congressional districts:

> Any number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives. As long as the criteria are nondiscriminatory, ... these are all legitimate objectives that on a proper showing could justify minor population deviations.

*Id.* (citations omitted).

Both in the evidence presented and in oral argument, the State has set forth several convincing, consistent, and legitimate justifications for the numerical deviations within H.B. 10.[3] These include: (1) keeping intact the three major regions that surround the center of the state (specifically, the Eastern Shore, Southern, and Western Maryland), (2) creating a minority voting district, and (3) recognizing incumbent representation, with its attendant seniority, in the House of Representatives.[4] (*See* State Mem. in Opp. at 23–28, *see also* the dissenting opp. hereto, at 38–41). We conclude that these justifications, which the State alleges are properly within the ambit of a state legislature's redistricting latitude and designed to achieve legitimate state goals, are sufficient to warrant the very small numerical variance among the congressional districts seen here. The analysis mandated by the Supreme Court cases applying Art. I, § 2 is, therefore, satisfied.

The dissent takes the position that *Karcher*'s numerical analysis is merely the beginning of the Art. I, § 2 inquiry. As we read the dissent, no state "classification" of "the people" (apparently a broader category than voters) that is the product of any political consideration is constitutionally justified. Only "neutral" classifications, such as natural geographic barriers, points of the compass, or, perhaps, historical municipal and county subdivision boundaries, are to be considered by the legislature as it apportions its population for the House of Representatives. In short, the dissent would appear to advance a position that would hold unconstitutional any redistricting plan that was in any way affected by considerations that could be labelled "political."

In *Karcher*'s footnote 6, Justice Brennan noted that *Kirkpatrick*'s and *Karcher*'s mandate for population equality among congressional districts alone would do "little to prevent what is known as gerrymandering." 462 U.S. at 734, 103 S.Ct. at 2660. Of course, nothing prevents the plaintiff/opponents of a redistricting plan from challenging that plan on constitutional grounds either inside or outside of Art. I, § 2. *Any* prohibited classification of or distinction among "the people" is still cognizable, for example, under the rubric of the First and Fourteenth Amendments. *See, e.g., Davis v. Bandemer,* 478 U.S. 109,

---

**3.** *See The Supreme Court, 1982 Term—Leading Cases,* 97 Harv.L.Rev. 70, 141 (1983), suggesting that *Karcher* teaches that such justifications are to be considered flexibly by the courts.

**4.** *See White v. Weiser,* 412 U.S. 783, 791, 93 S.Ct. 2348, 2352, 37 L.Ed.2d 335 (1972).

**398**

106 S.Ct. 2797, 92 L.Ed.2d 85 (1986).[5] The protections provided within Art. 1, § 2 speak for themselves. Further, the protections provided by the First and Fourteenth Amendments, as well as by many other parts of our Federal Constitution, provide a backstop to the "one person, one vote" requirement in Art. I, § 2. Moreover, as Justice Brennan recognized in footnote 6 of *Karcher,* state constitutional and statutory provisions also serve a similar backstopping purpose.

The idea that Art. I, § 2 prohibits taking any "political" factors into account is flatly contradicted by the language in *Karcher* itself:

> We have never denied that apportionment is a political process, or that state legislatures could pursue legitimate secondary objectives as long as those objectives were consistent with a good-faith effort to achieve population equality at the same time.

462 U.S. at 739, 103 S.Ct. at 2662. Nor is such a discussion unique to *Karcher.* The Supreme Court has long recognized the appropriateness of political considerations within the redistricting process. In *White v. Weiser,* 412 U.S. at 794, 93 S.Ct. at 2354, the Court noted that "from the beginning, we have recognized that reapportionment is primarily a matter for legislative consideration and determination...." Indeed, the Court there recognized and "d[id] not disparage" the state defendants' policy of promoting:

> " 'constituency-representative relations,' a policy frankly aimed at maintaining existing relationships between incumbent congressmen and their constituents and preserving the seniority the members of the State's delegation have achieved in the United States House of Representatives."

*Id.* at 791, 93 S.Ct. at 2352. Surely, such language does not recognize any command in Art. I, § 2 that "political" classifications cannot be made during redistricting.

As Justice Brennan has made clear, the Supreme Court is

willing to *defer* to state legislative policies, so long as they are consistent with constitutional norms, even if they require small differences in the population of congressional districts.

*Karcher,* 462 U.S. at 740, 103 S.Ct. at 2663 (emphasis added).

In this case, this Court defers to Maryland's legislature. The evidence, as the dissent states, shows that the General Assembly, *inter alia,* aimed to give Congressman Hoyer, a congressman with high ranking and importance in the federal House of Representatives, a "safe seat," to provide the majority black population in an area of Prince George's and Montgomery counties with a chance to choose a representative without requiring that person to run against a strong incumbent such as Congressman Hoyer, and to provide certain opportunities for Congresswoman Bentley and Congressman Cardin. Dissenting Opp. at 18–21. The reelection of incumbents as such was not listed specifically by Justice Brennan in *Karcher* as an example of an affirmative legislative justification sufficient to meet *Karcher's* second prong, though recognized in *White v. Weiser.* Neither is the establishment of a majority black district listed specifically in *Karcher,* but "preserving the strength of racial minority groups" is discussed. *Karcher,* 462 U.S. at 742, 103 S.Ct. at 2664. These aims, however, are clearly within *Karcher's* ambit. While Justice Brennan there concluded that the District Court's finding of a lack of causal connection between racial voting aims and the redistricting plan at issue was not "clearly erroneous," *id.* at 743, 103 S.Ct. at 2665, the sense of *Karcher* strongly suggests that if, as here, such a causal connection does exist, such aims can constitute an appropriate *Karcher* second-prong basis.

We also note that the "neutral criteria" redistricting called for by the dissent would in no way ensure maintenance of the territorial integrity of Anne Arundel County, which is what brought on this suit in the first place. Rather, adoption of the dissent's position would potentially subject

---

5. *See* discussion *post* at 399.

every congressional district in the United States to novel constitutional scrutiny. Furthermore, to mandate that a legislature reapportion with regard merely to "neutral criteria" (except for the dictates of the Voting Rights Act and the Fifteenth Amendment) is to give that legislature, in practice, no guidance at all. Indeed, it virtually guarantees that a federal court, in a sort of judicial receivership, will ultimately conduct redistricting—a process the Supreme Court has consistently recognized as political.[6]

## IV. OTHER CONSTITUTIONAL CONSIDERATIONS

Plaintiffs also contend that H.B. 10 represents an unconstitutional "gerrymander," and therefore that the Maryland General Assembly has discriminated against them, in violation of the Equal Protection Clause of the Fourteenth Amendment. In support of their position, plaintiffs cite *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), in which the Court held that gerrymandering for political purposes is justiciable under the Equal Protection Clause of the Fourteenth Amendment.[7]

What plaintiffs have presented in this instance is not a case of political gerrymandering as seen in *Davis.* The Court in *Davis* limited its holding—that political gerrymanders are justiciable—to cases involving partisan bias. "[E]ach political group in a State should have the same chance to elect representatives of its choice as any other political group." *Davis,* 478 U.S. at 124, 106 S.Ct. at 2806. Where a

legislature intentionally draws lines "to afford political groups in various districts an enhanced opportunity to elect legislators of their choice ... 'we *must* ... respond to [the] claims ... that even if acceptable populationwise, the ... plan was invidiously discriminatory because a 'political fairness principle' was followed.' " *Davis,* 478 U.S. at 124–25, 106 S.Ct. at 2806 (quoting *Gaffney v. Cummings,* 412 U.S. 735, 751–52, 93 S.Ct. 2321, 2330–31, 37 L.Ed.2d 298 (emphasis in original)). Thus, in *Davis,* the Supreme Court only reached the question of, whether, where one political party makes a claim of discrimination during redistricting, the issue is justiciable.

In the case before this Court, the plaintiffs represent both the Anne Arundel Democratic and Republican parties. The type of partisan discrimination treated in *Davis* apparently has not occurred here. Indeed, the plaintiffs contend that the discrimination which they suffer as a result of H.B. 10 stems from the effect that the division of Anne Arundel County has on the plaintiffs' ability to "effectively participate as a [group] and thereby influence the elective process and to secure the attention of the winning candidate." (Plaintiffs' Mem. in Opp. to State Defendants' Mot. to Dismiss And/Or Mot. for Sum. Judg. at 35.) In essence, therefore, the plaintiffs contend that they, as Anne Arundel County voters, have some form of constitutionally significant community interest which will be diluted if H.B. 10 goes into effect.[8]

Assuming justiciability and reaching the merits,[9] this federal court must keep in

---

**6.** We note that during the Maryland Senate Proceedings on October 21, 1991, the following colloquy took place:

PRESIDENT MILLER: We labored mightily, the majority leader and the chairman and myself, and we made a conscious decision that it was better that we adopt this plan with these modifications than let a nonelected federal judge, a non-political person draw a map for us.

VOICE: God help us.

Pls.Ex. 17 at 80–81.

**7.** As a threshold issue, we note that in *Davis* the Supreme Court was called upon to address a challenge to the partisan redistricting of the Indiana legislature, not to congressional redistricting.

**8.** Anne Arunel County is not the only County divided by HB 10. Others include Montgomery, Howard and Prince George's, all divided between two districts, and Baltimore City and Baltimore County, each divided among three districts.

**9.** The standard for establishing justiciability is well settled. *See Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1961). The court in *Baker* elucidated a three-part test: (1) the issue must not be more properly decided by a coequal part of government, (2) there must be no risk of foreign or domestic disturbance or embarrassment, and (3) there must be judicially discernible and manageable standards by which the case can be decided. *Id.* at 226, 82 S.Ct. at 714.

mind that the voice of the people of Maryland is most directly heard through the General Assembly of Maryland. While the interests of "the people," as the dissent emphasizes, predominate, the "people" of the State of Maryland cannot in 1991, even if they could have so done in 1789, practically be heard individually *via* a state-wide town meeting of the whole. The most direct channel of action by the "people" is *via* their elected representatives in both houses of Maryland's legislature—a branch of our total governmental structure, as is this Court. A federal court, in scrutinizing a congressional redistricting plan, should therefore think long and hard about rejecting the reasons—the justifications—of the state legislature.[10]

It is in such context that we consider and reject the plaintiffs' challenge to what they label as unconstitutional gerrymandering. We do not, as the dissent suggests, believe that there are no limits upon gerrymandering. We do not hold that the State is correct in conceding

> that under its interpretation Article I, § 2, would not be violated by a district line drawn to snake through the alleys

and cul-de-sacs of 23 different counties in order to match two white people for each black, or two democrats for each republican, for the purpose of advancing the chances that the favored class would win an election while diluting the vote of the unfavored class.

Dissenting Op. at 402. We do not have that specific example before us and therefore do not reach it.[11] If the territorial of Anne Arundel County is a classification—a proposition we doubt,[12] but also do not reach—it, like all classifications, must have a reasonable basis in fact, even if no suspect criterion such as race, religion, sex or the like is involved.

Underpinning the dissent appears to be the proposition that, independent of *Karcher* and of the numerical "one person-one vote" doctrine, political gerrymandering can be so egregiously unbearable that it cannot pass federal constitutional muster. We do not, and need not in this case, question that position. *See, e.g., Karcher,* 462 U.S. at 744, 103 S.Ct. at 2665 (Stevens, J., concurring); Daniel D. Polsby & Robert D. Popper, *The Third Criterion: Compactness as a Procedural Safeguard Against*

Both the second and third prongs of this test give us pause in this case.

**10.** In keeping with the dissent's historical analysis, we note that gerrymandering was not conceived out of the blue in this country. The "rotten borough"—one that had few electors or voters—was a similar concept and one that long plagued the English. A rotten borough was used to give a seat in Parliament to a person whom a political party wished to reward, albeit often a very able person.

Pocket boroughs, in which the member of Parliament could purchase his seat, similarly diluted the vote of the people whom he represented. Representative of the attitude that such politicians had towards their electorate is the following:

> *The following letter was written by Anthony Henley, Member of Parliament for Southampton from 1727 to 1734, to his constituents who had protested to him about the Excise Bill:*
> Gentlemen,
> I received yours and am surprised by your insolence in troubling me about the Excise. You know, what I very well know, that I bought you. And I know, what perhaps you think I don't know, you are now selling yourselves to Somebody Else; and I know what you do not know, that I am buying another

borough. May God's curse light upon you all: may your houses be as open and common to all Excise Officers as your wifes [sic] and daughters were to me, when I stood for your scoundrel corporation.
> Yours, etc.,
> Anthony Henley

John Julius Norwich, *Christmas Crackers* 93 (1986).

Rotten boroughs and other electoral anomalies were eliminated by Parliament, not by judicial decree, in the Reform Act of 1832. *See generally* 13 William S. Holdsworth, *A History of English Law* 239–59 (1952).

**11.** What constitutes political gerrymandering going so far beyond the pale as to be unacceptable in our federal constitutional setting is hard to define. But as Justice Stewart once wrote about pornography, most of us "know it when we see it." *See Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring). We can well afford, as Justice Brennan, writing in *Karcher* seems to have had in mind, leaving to another day and to another case the task of establishing federal constitutional limits to gerrymandering in congressional districting.

**12.** *See supra* at 399.

*Partisan Gerrymandering*, 9 Yale Law & Pol.Rev. 301 (1991). As Justice Brennan has noted, "[a] federal principle of population equality does not prevent any State from taking steps to inhibit gerrymandering, so long as a good-faith effort is made to achieve population equality as well." *Karcher*, 462 U.S. at 734 n. 6, 103 S.Ct. at 2660 n. 6.

The dissent may be suggesting that political considerations which constitute appropriate justifications under *Karcher*'s second prong somehow violate Art. I, § 2, or other federal constitutional mandates, or both. The answer to any such approach, however, is that the Supreme Court would hardly have put its stamp of approval on a justification under *Karcher*'s second prong, if such justification were constitutionally invalid for any other reason. In any event, a federal court is not prevented from granting relief under any available federal constitutional provision if gerrymandering violates it, and if the matter is justiciable. The point is that carving Anne Arundel County into four pieces—while perhaps enough to raise eyebrows—does not violate any federal constitutional provision, including the mandate of Art. I, § 2, to give full effect to the voice of the "people."

Furthermore the plaintiffs have not shown any discriminatory vote dilution. *See Davis*, 478 U.S. at 143, 106 S.Ct. at 2815. Nothing the plaintiffs have presented to this Court indicates that their vote will necessarily be any less powerful in any of the four congressional districts in which they will now reside. Nothing prevents the plaintiffs from joining the local organizations of the political parties of their choice and having whatever power they had previously to influence the political process. Thus, assuming *arguendo* that they present a justiciable issue, the plaintiffs fail to make a *Davis* showing of vote dilution.

Plaintiffs' claim also fails under a First Amendment analysis. Nothing about H.B. 10 affects in any proscribed way the plaintiffs' ability to participate in the political debate in any of the Maryland congressional districts in which they might find themselves. They are free to join pre-existing political committees, form new ones, or use whatever other means are at their disposal to influence the opinions of their congressional representatives.

To the extent that plaintiffs—and any of their fellow Anne Arundel Countians—are legitimately distressed by H.B. 10, they have suffered a political setback, but not a violation of their federal constitutional rights, through the action of "the people" as expressed by the directly elected representatives of "the people" of Maryland.

Based upon the principles articulated herein in the context of the evidence presented in this case, this Court concludes that the State defendants, on the merits, are entitled to judgment in their favor. Accordingly, judgment will be entered in their favor, by a separate order.

NIEMEYER, Circuit Judge, dissenting:

The Maryland legislature, using data about voters' political party registrations, their past voting habits, and their race, drew congressional district lines to depict the classic gerrymander in an attempt to control the outcome of future congressional elections. Because the use of such classifications in drawing district lines favors one class and of necessity dilutes the vote of another, the people are not represented directly and equally, as required by Art. I, § 2, of the United States Constitution.

I concur with the conclusion reached by the majority that the requirements of *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), have been satisfied by H.B. 10 in that each of the eight congressional districts created by it has, for all practical purposes, an equal population. I would not even find it necessary to pass from step one to step two of the *Karcher* analysis. Step one requires a determination of whether a good faith effort was made to divide the state into districts equal in population. Only if there is a "significant variance" between districts must step two be reached, which requires that the state justify the variance. *Id.* at 731, 103 S.Ct. at 2658. In this case the

greatest variance from the "ideal" district is seven persons. No policy or consideration, in my judgment, is served by shifting three or four persons from one district to another or needs to be advanced for failing to shift them.

The major failing, I respectfully submit, of the majority opinion is its acceptance of the position advanced by the State that once the requirements of *Karcher* are satisfied, the analysis ends. In other words, the majority holds that *Karcher* establishes a *per se* rule that once equality of numbers is achieved, no further analysis is appropriate to determine whether the requirements of Article I, § 2, have been met, even if the state's motive in establishing district lines were found to be invidious and the effect of its delineation were found to be the total dilution of the vote of a recognized class of people or voters. That position leads to the conclusion that politically or racially drawn lines, however gerrymandered, cannot violate Article I, § 2. The State thus conceded at oral argument that under its interpretation, Article I, § 2 would not be violated by a district line drawn to snake through the alleys and cul-de-sacs of 23 different counties in order to match two white people for each black, or two democrats for each republican, for the purpose of advancing the chances that the favored class would win an election while diluting the vote of the unfavored class.

While *Karcher* appropriately addresses vote dilution created by numerical inequalities among districts, it was never intended to overrule the other Supreme Court holdings, such as *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), which recognize the Constitution's prohibition against vote dilution by any classification and require that representation of the people be *direct and equal*. *Karcher* decided only the issue of when a variance in *population* among districts can be justified. The majority extends this limited holding to conclude that Article I requires nothing more than population equality. But in response to this dissenting opinion, the majority concedes "we do not ... believe there are no limits upon gerrymandering" imposed by Article I. Recognizing

the difficulty of making that concession, because gerrymandering "in our federal constitutional setting is hard to define," the majority concludes that "most of us 'know it when we see it'" (quoting *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring) (attempting to define pornography). Without acknowledging that our founding fathers intended to avoid duplicating the "rotten boroughs" problem of London, not by relying on state legislatures, but in adopting Article I to provide direct and equal representation of the people, *see Debates in the Federal Convention of 1787 as Reported by James Madison* 202 (James McClellan & Melvin E. Bradford eds., 1989) [hereinafter *Elliot's Debates*] (statement of James Wilson); *id.* at 207–08 (statement of James Madison), the majority recognizes the prohibition against gerrymandering, but only when it subjectively defines it as such.

In defending its plan on the contention that the states are free to draw district lines in any way they see fit, so long as each district includes the same number of people, the State fails to recognize that this case centers, not on a reapportionment of the Maryland legislature, but on the effectuation of the people's election of their Representatives in Congress. The distinction is both clear and critical. "There are fundamental differences between congressional districting under Art. I and the *Wesberry* line of cases on the one hand, and, on the other, state legislative reapportionments." *Gaffney v. Cummings*, 412 U.S. 735, 741–42, 93 S.Ct. 2321, 2325–26, 37 L.Ed.2d 298 (1973). Despite arguments by the State to the contrary, a state's role in constituting a House of Representatives is limited by federal law to establishing the "time, place and manner" of elections and to sending Representatives to Congress from districts that provide a "direct and equal" representation *of the people*, all of them. To accomplish that purpose no classification of the people can be made to advance the state legislature's preference for one class to the detriment of another, and clearly the state may not attempt to

dictate the outcome of congressional elections.

In this case the record shows, and the State concedes, that the delineation of congressional districts was based largely on classifications of voters by how they would vote in order to advance the interests of some existing Representatives, to assure one a "safe seat" at the expense of another, and to serve the political purposes of those involved in drawing the lines. The record shows, and the State also concedes, that racial classifications were made to create a district in which a black candidate *would win* and to remove the black voters of that district from the "safe seat" intended for another Congressman. The result of drawing lines using such impermissible classifications is the gerrymander depicted on the map attached.

A prohibition of Article I against classifications that are based on how the voters voted and can be expected to vote, for the purpose of steering the outcome of an election, does not, as the majority suggests, fail to recognize the political process inherent in every legislative act. Any legislative act is "political" to the extent that each legislator votes on the basis of personal philosophy, constituency, and the desire to be reelected. That is far different than a law enacted by the legislature which is designed to manipulate an election outcome out of fear that neutral criteria would permit the people to vote otherwise.

Because drawing lines that purposefully advance one political interest of necessity dilutes the opposing interest and therefore violates Article I, § 2, of the Constitution, I would not permit an election of Representatives to Congress to proceed on the basis of H.B. 10.

I

The legislative power of the United States is vested in a bicameral legislature, one body of which, the House of Representatives, is intended to represent *the people* of the several states, and the other, the Senate, as originally intended, to act as a representative body for *the states* themselves. *See* U.S. Const. art. I, §§ 1, 2 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives. The House of Representatives shall be composed of Members chosen every second Year by the People of the several States."). As described by James Madison in The Federalist No. 39,

[t]he House of Representatives, like that of one branch at least of all the State Legislatures, is elected immediately by the great body of the people. The Senate, like the present Congress, and the Senate of Maryland, derives its appointment indirectly from the people.

An important distinction is thus deliberately made between the states and the people.

The framers debated long whether *the states* should act as political agents for the people in selecting members of Congress, or whether instead *the people* deserve and require direct representation in the federal legislature. "While those who wanted both houses to represent the people had yielded on the Senate, they had not yielded on the House of Representatives. William Samuel Johnson ... had summed it up well: 'in *one* branch the *people*, ought to be represented; in the *other*, the *States*.'" *Wesberry*, 376 U.S. at 13, 84 S.Ct. at 533 (quoting 3 *The Records of the Federal Convention of 1787* 462 (Farrand ed. 1911) (emphasis in original)). Argument centered not only upon the appropriate method of ascertaining and distributing the relative power of representation among the states, but also, perhaps as importantly, upon the appropriate structure for assuring that the *people*, and not the *state legislatures*, achieve meaningful representation in the federal legislative body.

Article I, which is the outcome of that debate, clearly establishes the House of Representatives not only as a means for ensuring a distribution of political power on the federal level which corresponds to the relative populations of the states, but also as the body that is intended to represent the people and not the states. *See Elliot's Debates* at 75 ("Mr. Madison considered an election of one branch at least of the Legislature by the *people immediate-*

*ly,* as a clear principle of free [Government] and that this mode under proper regulations had the additional advantage of securing better representatives, as well as of *avoiding too great an agency of the State Governments in the General one.*") (emphasis added); *id.* at 39–45 (reporting that some delegates disfavored popular election of the first branch of the legislature, while others, including Mr. Mason and Mr. Wilson argued strongly for an election of the larger branch of the legislature by the people); *Wesberry,* 376 U.S. at 14, 84 S.Ct. at 533 ("The House of Representatives, the Convention agreed, was to represent the people as individuals, and on a basis of complete equality. . . .").

The deliberate and careful distinction thus made in the House of Representatives for representation of the people and not the state legislatures is preserved throughout the provisions establishing the House of Representatives and regulating its membership. Even the question of who voted for members of the House of Representatives was not the ultimate question, so long as whoever was entitled to vote represented the people. Reasoning from a principle that the state governments had already been constituted *by the people* and from a desire to harmonize voting privileges in the given States so that voter qualifications would be similar for state and federal elections, the founders carefully bypassed state legislatures and tied the right to vote to the provisions in each state constitution providing voting rights for its largest legislative house. Some were concerned with the problems which might arise from the establishment of differing qualifications for federal and state elections. *See Elliot's Debates* at 382 ("It would be very hard & disagreeable for the same persons at the same time, to vote for representatives in the State Legislature and to be excluded from a vote for those in the [National] Legislature.") (statement of Mr. Wilson). But most delegates primarily feared putting power to modify elector qualifications in the hands of either the state or the federal legislature. "The right of suffrage was a tender point, and strongly guarded by most State Constitutions." *Id.* at 383

(statement of Mr. Elseworth). Colonel Mason from Virginia agreed: "A power to alter the qualifications would be a dangerous power in the hands of the Legislature." *Id.; see also id.* at 385 ("A gradual abridgment of [the right of suffrage] has been the mode in which Aristocracies have been built on the ruins of popular forms.") (statement of Mr. Madison). In the end, it was determined that the right of suffrage must be left ultimately to neither state nor federal legislatures, but *to the people.* Thus the ability to vote for members of the House of Representatives was tied to the existing qualifications, fixed by state constitutions, for the most numerous body of the state legislatures. *See* U.S. Const. art. I, § 2, cl. 1. As noted in The Federalist No. 52 (James Madison),

> [t]he provision made by the convention appears therefore, to be the best that lay within their option. It must be satisfactory to every State; because it is conformable to the standard already established or which may be established by the State itself. It will be safe to the United States; because, being fixed by the State Constitutions, *it is not alterable by the State Governments,* and it cannot be feared that the people of the States will alter this part of their Constitutions, in such a manner as to abridge the rights secured to them by the Federal Constitution.

(emphasis added).

Only in setting the time, place and manner of elections did the framers expressly defer to state legislatures, and then only with the reservation to the federal government of ultimate power on the issue. Article I, § 4, cl. 1, provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." *See also Elliot's Debates* at 403 ("[T]he Legislatures of the States ought not to have the uncontrolled right of regulating the times places & manner of holding elections. . . . It was impossible to

foresee all the abuses that might be made of the discretionary power.") (statement of Mr. Madison); *id.* at 404 ("If this power be not given to the [National] Legislature, their right of judging of the returns of their members may be frustrated.") (statement of Mr. King).

There can be no question that the issue of determining the method of selecting members of the House of Representatives is uniquely and exclusively a federal question, with only a limited role given to the states. *See Ex Parte Yarbrough,* 110 U.S. 651, 663, 4 S.Ct. 152, 28 L.Ed. 274 (1884) ("It is not true ... that electors for members of Congress owe their right to vote to the State law....."); *United States v. Classic,* 313 U.S. 299, 315, 61 S.Ct. 1031, 1037, 85 L.Ed. 1368 (1941) ("While, in a loose sense, the right to vote for representatives in Congress is sometimes spoken of as a right derived from the states, this statement is true only in the sense that the states are authorized by the Constitution, to legislate on the subject as provided by § 2 of Art. I....") (citations omitted). The Constitution finally summarizes the supremacy of the federal role when it provides that each House of Congress is responsible for judging elections and the qualifications of its members. *See* U.S. Const. art. I, § 5, cl. 1. And no exception is made for determining the size, location, and configuration of congressional districts. These must conform to the principle of establishing direct representation of the people, as required in Article I.

Article I makes no requirement that members of Congress represent districts within a state, so long as the number allocated to a given state is determined by population. Congress did for many years mandate and actively regulate congressional districting, but since 1929 it has assumed a less active role in that regard. *See Wesberry,* 376 U.S. at 42–44, 84 S.Ct. at 547–49 (Harlan, J., dissenting). This leaves to the states that role, but always in service to the federal government and the people in accordance with the federal Constitution. *Cf. White v. Weiser,* 412 U.S. 783, 797, 93 S.Ct. 2348, 2355, 37 L.Ed.2d 335 (1973) ("Of course, the District Court should defer to state policy in fashioning relief [in a congressional redistricting case] only where the policy is consistent with constitutional norms and is not itself vulnerable to legal challenge.").

When a state divides itself into districts, the division must preserve the representation of the people, directly and without interference by any agency of the state legislature. The direct representation of the people inherently requires that all the people of a state be represented, and to accomplish that goal the representation must be equal. This theme, that the representation of the people in the House of Representatives must be direct and equal, was recurring and consistent in the debates of the framers, and was adequately and early summarized by Justice Story:

> We accordingly find, that in the section under consideration, the house of representatives is required to be composed of representatives chosen by the people of the several states. The choice, too, is to be made immediately by them; so that *the power is direct; the influence direct; and the responsibility direct.* If any intermediate agency had been adopted, such as a choice through an electoral college, or by official personages, or by select and specially qualified functionaries *pro hac vice,* it is obvious, that the dependence of the representatives upon the people, and the responsibility to them, would have been far less felt, and far more obstructed.

Joseph Story, *Commentaries on the Constitution of the United States* § 292 (1833) (emphasis added). In a detailed analysis of Article I, the Supreme Court reached the same conclusion in *Wesberry.* Reciting the debates, the Supreme Court stated that "the House of Representatives was meant to be free of the malapportionment then existing in some of the state legislatures" and that Congress' supervisory power under Article I, § 4, was intended "to vindicate the people's right to equality of representation." *Wesberry,* 376 U.S. at 16, 84 S.Ct. at 534. Equal representation provides to the people a vote of equal weight wherever the people are located. Thus, the

Court said, "[e]lections are equal, when a given number of citizens, in one part of the state, choose as many representatives, as are chosen by the same number of citizens, in any other part of the state." *Id.* at 17, 84 S.Ct. at 535 (quoting a lecture of Justice James Wilson, who participated actively in the Constitutional Convention). The principle has been summarized as follows: "The basic constitutional principle of equal representation established by Art. I § 2 forbids and eliminates, so far as congressional representation is concerned, the consideration of any factor other than population." *Preisler v. Secretary of State of Missouri,* 257 F.Supp. 953, 973 (W.D.Mo.1966) (decision of three judge court), *aff'd Kirkpatrick v. Preisler,* 385 U.S. 450, 87 S.Ct. 613, 17 L.Ed.2d 511 (1967); *cf. Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (holding that the Fourteenth Amendment guarantees that a State, in dividing itself into geographical voting districts, may not identify voters of one political party with the intent and effect of diluting the vote of another party).

It cannot legitimately be disputed, therefore, that under the structure of the Constitution, the House of Representatives is established to provide direct and equal representation of the people without any interfering agency on the part of the states. The states' role is limited to establishing the time, place and manner of elections (subject to federal supervision) and to providing the people with districts that assure direct and equal representation. The criteria to be applied by the states in discharging this responsibility can be based only on policies which secure the direct and equal representation *of the people*—not of legislators, interest groups, or perceived interests of the state as a whole—in order to assure representation without vote dilution for a particular interest. Accordingly, it must be conceded that the right of the people to elect directly their Representatives to the larger House of the federal legislature means nothing if the Constitution does not forbid the states from manipulating the boundaries of congressional districts in attempts to influence the outcome of the people's congressional elections.

This said, one must ask what constitutionally permissible means are available to the states in carrying out their duty to designate representative districts which effectuate the right of their citizens to elect a delegation to the House. The starting point must be the proposition that the state legislatures, and consequently the district lines that they draw, should aim at minimizing the states' effect on the outcome of the election. The division must not focus on a particular classification of citizens in a way that "unnecessarily abridges" their vote. *See Wesberry,* 376 U.S. at 17–18, 84 S.Ct. at 535 ("Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right."). It is thus observed that in dividing its citizens into geographical districts, a state may not identify voters as rich, poor, democratic, republican, persons who voted for one candidate, or persons who are expected to vote for another. For to do so would constitute "the deliberate and arbitrary distortion of district boundaries and populations for partisan or personal political purposes"—the classic definition of a gerrymander. *See Kirkpatrick v. Preisler,* 394 U.S. 526, 538, 89 S.Ct. 1225, 1232, 22 L.Ed.2d 519 (1969) (Fortas, J., concurring). Not only do such classifications interpose an improper interference by the state, an agency that was clearly intended to be excluded in the determination of House members, but more insidiously, the recognition and enhancement of one class of people or voters necessarily dilutes the representation and vote of other classes not favored.

When we eliminate from consideration any classification of the people or of the voters for the purpose of favoring one class and diluting another, we are left with criteria for creating districts in a manner that is "neutral." *Cf. Karcher,* 462 U.S. at 759, 103 S.Ct. at 2674 ("[That] neutral decisionmakers developed the plan on the basis of neutral criteria" along with other factors, results in attachment of "a strong presumption of validity [to the redistricting plan].") (Stevens, J., concurring). While the possibilities are numerous, for whatev-

er practical reasons may exist, the historical choice has been geological structures and long-standing boundaries, including state municipal and county subdivision boundaries. It must be recognized from the start that even these criteria are not absolutely neutral. *See Davis v. Bandemer*, 478 U.S. at 129, 106 S.Ct. at 2808 (arguing that improper political intent in state redistricting should be easily proved because "[t]he reality is that districting inevitably has and is intended to have substantial political consequences" (quoting *Gaffney*, 412 U.S. at 753, 93 S.Ct. at 2331)). But to conclude that the nonexistence of totally neutral districting criteria means that no limits may be placed on any attempt by the States to alter the outcome of the election of the people's representatives in Congress is tantamount to concluding that the Article I debates at the Constitutional Convention had no meaning.

Concepts of compactness and contiguity and restrictions to established geographical features have served, since the earliest decisions to divide the states into congressional districts, as constraints on the political will of state legislatures against the usurpation of the people's vote. *See, e.g.*, Act of June 25, 1842, § 2, 5 Stat. 491 (1842); *Karcher*, 462 U.S. at 756, 103 S.Ct. at 2673 ("To some extent, geographical compactness serves independent values; it facilitates political organization, electoral campaigning, and constituent representation.") (Stevens, J., concurring); *id.* at 776, 103 S.Ct. at 2683 (arguing that departure from existing geographical and political boundaries leads to unlimited potential for deliberate partisan gerrymandering) (White, J., dissenting). While other constraints may prove to be "more neutral," these restrictions may at least be said to establish a "floor of neutrality" below which the states cannot venture.

As a first principle in establishing district boundaries, then, a state legislature may make no classification of voters or of the people (except possibly to comply with the Fifteenth Amendment and the Voting Rights Act as hereafter noted), but instead must rely on available neutral criteria. Just as the numerosity requirement estab-lished by *Kirkpatrick* and *Karcher* is strictly enforced to prevent vote dilution caused by variances in population, so too must the prohibition against voter classifications.

The Fifteenth Amendment requires application of a second principle allowing limited consideration of race. The Great Compromise classified slaves for the purpose of measuring the relative representation of the States. *See* U.S. Const., art. I, § 2, cl. 3. Even during the debates this was problematic and shortly thereafter Madison awkwardly sought to defend it. *See* The Federalist No. 54 (James Madison). The American Civil War, the adoption of the post-war Amendments, including particularly the Fifteenth Amendment, and the enactment of the Voting Rights Act of 1965, 42 U.S.C. § 1973 (1988), have attempted to correct that error. Today it is the law of the land that, before drawing any lines, we ensure that "the right of any citizen of the United States to vote [is neither abridged nor denied] on account of race or color." 42 U.S.C. § 1973 (1988); *see Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. at 2752, 92 L.Ed.2d 25 (1986). This second principle, along with the strict equality of district populations also required by Article I, § 2, is a necessary overlay to any redistricting plan. Naturally, the strict one-person, one-vote requirement can only be applied after the districting process is begun using neutral criteria. Otherwise, the required precision of the apportionment limitation would lead to an apparent justification for affecting the outcome of the people's election. *See Wells v. Rockefeller*, 394 U.S. 542, 551, 89 S.Ct. 1234, 1240, 22 L.Ed.2d 535 (1969) (contending that a standard "of absolute equality is perfectly compatible with 'gerrymandering' of the worst sort") (Harlan, J., dissenting).

Finally, any state legislative enactment that draws congressional district lines is subject, in theory, to the Equal Protection Clause of the Fourteenth Amendment. As a practical matter, however, the issue need not be reached in congressional redistricting cases because compliance by the state with the requirement of Article I to provide

direct and equal representation of the people in drawing district lines necessarily provides the people equal protection of the laws. Moreover, the standard for satisfying Article I is a stricter one than that for satisfying the Fourteenth Amendment. *See Karcher,* 462 U.S. at 732–33, 103 S.Ct. at 2659–60.

In summary, to comply with the Constitution and other federal law, a congressional redistricting plan undertaken by a state legislature must begin with neutral criteria, such as natural barriers or city and county lines, and then be modified to the extent necessary to achieve numerical equality of population within the districts. Finally, the state must check to ensure that the resulting districts comply with the Fifteenth Amendment and the applicable mandates of the Voting Rights Act.

## II

Given the conclusion that Article I requires more than simple numerical equivalence of congressional districts, I would go beyond the fact finding efforts of the majority to consider whether the State used other than neutral criteria in devising its plan to divide Maryland into eight congressional districts. In doing so, it is appropriate to look first at the map which is the final product of the State's decisionmaking process. If the plan forms compact and contiguous districts which largely follow county, municipal, or identifiable geographic boundaries, then the court can presume, absent direct evidence to the contrary, that the districting plan is neutral. On the other hand, where the final plan includes shapes that look more like characters on a Saturday morning television program than compact voting districts, the court should look behind the plan to question how the legislature arrived at its final decision.

A look at a map depicting the redistricting plan suggests that the State did apply neutral criteria in preserving intact the southern, eastern and western regions of Maryland. The district lines in these three regions follow county boundaries and geographic lines. In the center of the state, however, the convoluted shapes of the state's remaining five congressional districts call into question the neutrality of the plan. District 4, which lies predominantly in Prince George's County, wanders across the county line into Montgomery County, from which it plucks about 159,000 persons. District 3, which was referred to on the floor of the House of Delegates as the "splitting amoeba," darts in and out of the City of Baltimore, as it weaves its way through three other counties as well. District 1, which encompasses all of Maryland's eastern shore, leaps across the Chesapeake Bay into Anne Arundel County, rather than follow the contour of the bay and the state's northern border into Harford County. And District 2 finds its way from Baltimore County across the Patapsco River into Anne Arundel County to pick up 45,000 residents of Dundalk and vicinity.

The evidence in this case substantiates the suspicion that these districts were drawn to serve political interests, a fact conceded by the State at oral argument. In the northern portion the overriding concern of the state legislature was to accommodate the desires of U.S. Representative Bentley. She both publicly and privately objected to the initial plan of the Governor's Advisory Committee and threatened to challenge it in court because the plan would have eliminated Bentley's 1990 district and paired her against U.S. Representative Gilchrist in District 1 on Maryland's eastern shore. In addition, Representative Bentley informed state Senator Pica, head of the Maryland Senate redistricting committee, of her desire for "a district she believed she could win [in] the next election." Ultimately she got what she wanted.

State Senator Miller, who served on both the Governor's Advisory Committee and the final conference committee, thought that "it was particularly unfair to Congresswoman Helen Bentley to ask her to consider running on the Eastern Shore, especially when her forte was the port of Baltimore, which is in the Dundalk, Essex region." In the final redistricting plan, Bentley's District 2 jumps the Patapsco River into Anne Arundel County to secure

for her the port area. In addition, rather than extend District 1 from the eastern shore into Representative Bentley's district, the legislators attached a portion of Anne Arundel County to the eastern shore by way of the Chesapeake Bay Bridge.

There are no apparent geographic explanations for the unique configuration presented by District 3. Interestingly, according to Bentley's legislative director, U.S. Representative Cardin wanted portions of Baltimore City, Baltimore County, and Howard County, three of the four counties through which District 3 now snakes. Furthermore, the uneven boundary between this district and that of Representative Bentley was apparently carefully drawn to allocate between the two districts particular politicians, including two state senators, a state delegate and a United States attorney.

A third cause of the curious division of the State's center was the clear desire to construct a district for Representative Hoyer, the fourth ranked Democratic member of the United States Congress. Senator Pica reported that there was a "prevailing feeling" in the General Assembly that the plan should assure Hoyer a "safe seat." This report was confirmed by a congressional aid who heard several state senators on the floor of the senate chamber discussing efforts to do so. The efforts were also much the subject of the press at the time. Hoyer expressed an interest in representing Prince George's County, where he resides, as well as southern Maryland, where he maintains a vacation home.

The need to draw Representative Hoyer a "new" district arose from the perceived need to create a black-majority district in Prince George's County along the northeastern border of the District of Columbia. Hoyer's old district in Prince George's County would well have suited this requirement, but the legislators wanted to "guarantee" the election of a minority candidate and feared that Hoyer would lose if forced to run in a minority district. As the State explained,

> [An alternative plan], while creating a minority district, puts a white incumbent in the district. While this may have survived a legal challenge, this plan increases the probability that the State could lose one of its most senior and powerful congressmen. The legislature was at liberty to decide that the possibility of losing Congressman Hoyer was detrimental to the entire state. This plan would also have made it more difficult for a minority to be elected from that district.

Overriding desires expressed at the public meeting in Hyattsville, the legislators thus carved the county into two districts. The minority district, District 4, winds through Prince George's County (conveniently avoiding the residence of Mr. Hoyer) and into southeastern Montgomery County. Consonant with Hoyer's wishes, District 5 includes the remainder of Prince George's County and all of Southern Maryland.

Ironically, when questioned whether a "new white-majority district" should be created for Hoyer, seventy per cent of the Prince George's County voters polled responded "No." Statewide, sixty-five per cent also responded "No." When made aware of these results, however, Senator Pica replied, "[K]nowing Congressman Hoyer's position in the House of Representatives, I would still try to reserve that status in the Congress."

Creating a minority district in which Hoyer would not run prompted the legislators to allocate the remaining seven districts among the eight incumbent representatives. The final placement of the district boundaries in the center of the State was determined by the decision to eliminate Representative McMillan's former district and pit him, not against Bentley, Hoyer, or Cardin, but against the junior Republican Representative, Wayne Gilchrist, of District 1. Indeed, the precinct in which McMillan resides is the only one in the Crofton area which was included in that portion of Anne Arundel County that was swept across the bay into District 1.

In light of this evidence, I find that the State did not use neutral criteria to establish its eight congressional districts. Instead, the driving force behind the placement of the new district boundaries was a desire to promote the election bids of cer-

tain incumbent representatives at the expense of other, less senior incumbents. The Constitution gives to the voters of Maryland a right to make their own choices about reelecting their present Congressmen to represent them again in Congress. The State's attempts to defeat that right by manipulating district lines, either by unnecessarily pitting incumbents against one another or by enhancing the prospects of one candidate over another, cannot be reconciled with Article I, § 2, and *Wesberry*.

I therefore conclude that Maryland's 1991 congressional redistricting plan as contained in H.B. 10 violates the mandate of Article 1, § 2, that such plans provide direct and equal representation to the people, and, accordingly, I would not permit an election to proceed on the basis of H.B. 10.

For the foregoing reasons, I respectfully dissent.

## APPENDIX
Map of Central Maryland Showing
Congressional Districts Adopted in H.B. 10
(October 22, 1991)